# MATTER OF HEUERMANN

(240 N.W.2d 603)

(File No. 11682. Opinion filed March 30, 1976)

Eugene C. Mahoney of Doyle & Mahoney, Ellsworth E. Evans, of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for petitioner.

Fred J. Homeyer, Pierre, for Judicial Qualifications Commission.

BY THE COURT.

In 1972 the people of this state adopted Article V of the South Dakota Constitution, the Judicial Article. Section 9 of that Article provides that the legislature should create a judicial qualifications commission. The section states:

"On recommendation of the judicial qualifications commission the Supreme Court, after hearing, may censure, remove or retire a justice or judge for action which constitutes willful misconduct in office, willful and persistent failure to perform his duties, habitual intemperance, disability that seriously interferes with the performance of the duties or conduct prejudicial to the administration of justice which brings a judicial office into disrepute."

The legislature in 1973 adopted SDCL 16-1A-1 through 16-1A-13, the Judicial Qualifications Act (Act) which vitalized the amendment. This court thereafter promulgated rules of procedure. See SDCL 16-1A Appendix.

After a hearing on a complaint against the petitioner, the Judicial Qualifications Commission (Commission) recommended that this court impose censure upon the petitioner "because his conduct was prejudicial to the administration of justice which brought his judicial office into disrepute."[1]

---

1. The findings of the Commission, in pertinent part, are set forth as follows:
   "Count I sets forth several proceedings to determine inheritance taxes, wherein Mrs. Heuermann was the attorney for the applicant and the orders issued by Judge Heuermann either found no inheritance tax due or ordered payment of the stipulated tax. The Commission feels these matters were perfunctory and routine in nature. They could have been performed by a ministerial officer.
   "In some guardianship proceedings, accounts were submitted which required or requested that attorney's fees to Mrs. Heuermann be fixed.
   "In several regular or special probate matters the Court was asked to fix and direct payment of attorney's fees to Mrs. Heuermann as Counsel. The record is often uncertain as to the extent Judge Heuermann actually exercised his authority to fix her attorney fees. However, it appears undisputed he retained the power to make such determinations. The Commission feels that his failure to disqualify himself as to such matters is significant. The shadow of the Court's power is potent even when the record is uncertain as to the extent it played in actually setting the fee.
   "The charges in Count VI concerning the Farnsworth estate were supported by evidence which indicated a clear situation where Judge Heuermann showed gross indiscretion in appointing his wife as attorney for the minors and in not disqualifying himself in fixing fees for the attorneys.
   "SDCL 16-18-3 signals a clear legislative intent that no Judge of a probate court is to benefit financially either directly or indirectly from his functions as a Judge.
   "Judge Heuermann testified on direct examination:
   'Q. By the way, how do you handle your spending affairs? Does Laura have her own bank account, so to speak?
   A. We have a Trust Account?
   Q. No, just answer my question.
   A. Yes.
   Q. Does she?
   A. Yes.
   Q. And do you and Laura have a joint account that each of you can draw out of?
   A. Yes.
   Q. And is that what us old fellows call a grocery account?
   A. Yes.'
   "On Cross-Examination by Mr. Homeyer, Judge Heuermann said this:
   'Q. Judge Heuermann, as I understood you to say, why your wife maintains a separate bank account in which she puts the fees which she earns in the practice of law, is that right?
   A. That's right.
   Q. Does she use that for her own support, is that it, or where does it eventually wind up?
   A. She does whatever she wants to do with it.
   Q. In other words, does she buy clothes with it? Does she—
   A. To the best of my knowledge, if she wants to buy clothes, she would put it in our joint account first. I imagine she—I know she must make transfers of it on occasion.
   Q. Does she use it to educate the children?
   A. Basically, she has paid for most of the education of the children, yes.

The issues which we must resolve in determining whether to impose a penalty reflect the fact that this is the first case to arise under the Act. The parties have not, unfortunately, briefed all of these issues, but their resolution is a prerequisite to action by this court. The issues to be resolved are (1) the proper standard of

Q. Then to that extent, at least, she has relieved you of that responsibility? She assists?
A. Well, I couldn't give you a breakdown, but I know she has paid for the bulk of it.
Q. In your income tax return, do you file a joint income tax return?
A. Yes, sir.
Q. And in that is included the salary you receive as County District Judge?
A. Yes, sir.
Q. And the amount she receives in the practice of law?
A. Yes, sir.'

"It appears that at least part of the fees received by Laura Heuermann from matters heard and determined by Judge Heuermann reached their joint checking account. This money was used for groceries, clothes and education and either directly benefited the Judge or diminished his legal responsibilities of support. Apparently, joint rather than separate income tax returns were found advantageous.

"This impropriety was aggravated in the matter of the estate of Johannes W. Swart a/k/a J. W. Swart deceased, bearing file Number 20379. (See page C-#4 of transcript). Judge Heuermann was a witness to decedent's Will. With the exception of proving the Will, he presided over all proceedings involved in the probate of this estate. He was requested to fix the fees for his wife who was the sole attorney throughout. This did violence to the obvious intent and purpose of SDCL 16-9-23. We see no justification in the claim that no Judge advised him these practices were wrong or that no one was damaged therefrom.

"FINDING II

"Count III alleges that Judge Heuermann improperly accompanied law enforcement officers to Florida to return four runaway boys and thereafter sat as the Judge at their hearings. It appears from the testimony of Judge Heuermann that this occasion in December 1973 was the first in over thirteen and one-half years on the bench that he found it necessary or advisable to accompany law enforcement officers to return juvenile subjects.

"It seems ironic that this trip was at a time when the more moderate Florida climate coincided with the Miami Dolphins playing a home game which he found convenient to attend. This trip was financed in part by the County and partly by some of the parents of the returned boys. The parents of these boys were not then in a position to object to this captive expense since Judge Heuermann sat in disposition of the cases. The surprising part of this Count is that Judge Heuermann does not seem to recognize or concede how it could adversely tarnish the image of the Court. He seemed to mitigate the experience by two factors: (1) he paid for the football game tickets and (2) the boys had the benefit of visiting with him while traveling home.

"FINDING III

"Count IV. The thrust of this charge is a letter (Ex. 43) from Judge William H. Heuermann to Attorney Peder K. Ecker of Sioux Falls relating to a juvenile matter. The most objectionable part of this letter was Paragraph 2 of Page 2 which reads as follows:

'Your letter to Mr. Bahnson was replete with errors, misconceptions, and unworthy of a member of the South Dakota State Bar. He did not release this boy from the Training School, and he helped effect his return. Upon learning of the boy's release, he contacted the mother, who advised that the boy was going into the Air Force.'

proof, (2) the proper scope of review of the Commission's findings of fact and recommendation, (3) whether the imposition of a penalty is justified by the facts of this case, and (4) finally, whether the Commission and this court lack the authority to consider actions which occurred before the effective date of the Act.

## *Standard of Proof.*

■ The first issue we consider is appropriate standard of

---

"Judge Heuermann mailed copies of that letter to Mr. Ed Lacy of Trent, South Dakota, the victim of the offense and Mr. and Mrs. Irvin Dubbelde of Sioux Falls, South Dakota, clients of Mr. Ecker. Obviously the tone of this letter was not consistent with what is expected of a Judge of a Court of record to a member of the bar who disagrees with his review of the law. Mailing copies of the improvident language to lay people and clients was an aggravating circumstance.

"FINDING IV

"In addition to the original Counts, an additional charge known as Count VIII alleges that Keith B. Schenkel, a juvenile delinquent, was arrested March 8, 1966, for forgery.

"Judge Heuermann sentenced him to one year in the County jail, but suspended it on condition he return to the Army and stay out of South Dakota for one year. He underwent plastic surgery at the Great Lakes Naval Hospital. While convalescing, he returned to Sioux Falls in violation of the suspension. It appears that without being heard, his suspended sentence was revoked and he was placed in jail for about one year. While the treatment accorded this juvenile and his mother offends our basic concepts of fairness and courtesy, this may, as claimed, have been due to a heavy workload. By current standards such a summary disposition would be highly improper. Bernal v. Hershman (Wis.) [54 Wis.2d 626] 196 N.W.2d 721.

"In retrospect we then had the benefit of State v. Elder (S.D.) [77 S.D. 540] 95 N.W.2d [592] 594 holding that revocation of an adult's probation must be based on a factual showing sufficient to justify the exercise of the Court's discretion, but that otherwise no particular source, manner or degree of proof was required. However, the law did not then clearly extend to juveniles the same rights afforded adults. Kent v. U.S., 383 US 541, 16 L ed 2d 84, 86 SCt 1045 decided in 1966, and In Re Gault 387 US 1, 18 L ed 2d 527, 87 SCt 1428 decided in 1967 announced that juvenile delinquency proceedings which may lead to commitment must measure up to the essentials of due process and fair treatment.

"Regardless of the legal rights and status of juveniles during the time here involved, the Commission wishes to emphasize that judicial inattention or indifference to the basic rights of juveniles as appears in this record should never be condoned.

"CONCLUSION AND RECOMMENDATION

"William H. Heuermann testified in his own behalf. The Commission gathered that he regarded the charges as frivolous and an unwarranted demand on his time. The Commission does not share that feeling. His attitude, particularly towards the Examiner, seemed belligerent. This was not appreciated. The Examiner did his job in a dignified and gentlemanly manner. Based on the above findings and the Commission finding good cause, it is the unanimous recommendation of this Commission that Judge William H. Heuermann be censured as to Counts I, III, IV, V, VI and VIII because his conduct was prejudicial to the administration of justice which brought his judicial office into disrepute."

proof in proceedings under the Act. We note that it would be inapposite to require proof "beyond a reasonable doubt" as this is not a criminal prosecution. Proof by a mere preponderance of the evidence is also inapposite because of the severity of the sanction which can be imposed. We conclude that the proper standard of proof is by "clear and convincing evidence." Such a standard provides adequate protection for the party subject to charges, but at the same time does not demand so much evidence that the ability of the Commission and this court to effectively oversee the judiciary is impaired. We note that this standard has been adopted in Alaska and California, upon whose statutes our own is based.[2] See In Re Hanson, 1975, Alaska, 532 P.2d 303; Geiler v. Commission on Judicial Qualifications, 1973, 10 Cal.3d 270, 110 Cal.Rptr. 201, 515 P.2d 1. See also, In Re Haggerty, 1970, 257 La. 1, 241 So.2d 469, 479; In Re Diener, 1973, 268 Md. 659, 304 A.2d 587; In Re Rome, 1975, 218 Kan. 198, 542 P.2d 676.

*Scope of Review.*

We next consider the proper scope of review of the Commission's findings and recommendation. A single state, Alaska, briefly adopted the "substantial evidence" rule. In Re Robson, 1972, Alaska, 500 P.2d 657, 659. However, Alaska retreated from that stand in 1975 to recognize that the Supreme Court had an obligation to undertake "an independent evaluation of the evidence and the recommendation of the Commission." In Re Hanson, 532 P.2d at 308. In so doing, Alaska fell in line with virtually every other state which had considered the question, including California, Geiler v. Commission on Judicial Qualifications, supra, and Maryland, In Re Diener, supra.

The rationale for requiring an independent evaluation of the evidence and recommendation is that the Act puts the burden of imposing the sanction squarely on the Supreme Court; the Commission has power only to recommend. With the power to impose

---

2. We find that the application of the Rules of Civil Procedure in appellate proceedings before the Supreme Court would clearly be "inappropriate" with regard to this issue. See Appendix to Chapter 16-1A, Rule 19(c). Such application would presumably result in the use of the "clearly erroneous" rule, SDCL 15-6-52(a), which would obviously be inconsistent with the duty imposed upon this court to impose the final sanction. See the text accompanying footnote 3.

a punishment comes the concomitant obligation to conduct an independent inquiry into the evidence to determine whether that evidence merits imposition of the sanction recommended.[3]

Thus, in every case brought to this court on a recommendation from the Commission, we must determine whether the evidence clearly and convincingly proves that the petitioner engaged in conduct which, upon our independent inquiry, merits the imposition of the sanction recommended.

*Evidence.*

With this standard in mind, we will briefly summarize the results of our inquiry. It is undisputed that petitioner's wife, a practicing attorney, frequently appeared before the petitioner in probate and guardianship matters. This conduct extends back in time for at least a decade and continued even after the complaint had been filed against the petitioner.[4] Furthermore, the petitioner by his own admission persistently violated SDCL 16-18-3 in that his wife deposited the proceeds of fees realized from practicing in petitioner's court in a joint checking account, and otherwise used the funds to pay obligations such as the education of their children, which fees resulted in a direct financial benefit to the petitioner (see petitioner's testimony set forth in footnote 1).

In each of the cases referred to, the petitioner approved the fee to be paid to his wife. In at least one case, the petitioner's wife submitted a brief to the petitioner on whether a will should be admitted to probate, a matter which was indisputably contested. She also participated in the questioning of witnesses before him in that case.

It is also clear that the petitioner once wrote a letter strongly criticizing a Sioux Falls attorney and sent a copy of the letter to the attorney's client. The original of the letter was sent to

3. We reject application of the Rules of Civil Procedure in appellate proceedings to this issue for the reasons cited in the text above and in footnote 2.

4. It will be noted that this conduct is now explicitly forbidden by the South Dakota Code of Judicial Conduct, Canon 3C(I)(d)(ii). Judge Heuermann has assured the Commission that his wife no longer appears before him.

parties who were considering suits against the particular client, and the letter strongly urged that the suit under consideration be commenced.

Furthermore, it appears that the petitioner, without a hearing and without attention to the rudiments of fairness, once revoked a suspension of a one-year sentence imposed upon a juvenile. In so doing the petitioner refused even to speak to the young man (who was home on leave from the army) or to his mother although the mother waited long hours outside of the petitioner's door after her son was incarcerated. We cannot condone the rude and indifferent manner in which judicial action was so summarily taken. See In Re Rome, 542 P.2d at 685. See also the discussion at footnote 1, Finding IV.

Finally, the petitioner traveled to Miami, Florida, in December of 1973, ostensibly to pick up four runaway boys. During that trip he attended a home game of the Miami Dolphins (at his own expense). The trip was otherwise paid for in part by the county and in part by certain of the parents of the boys. The petitioner attempted to justify the trip by reasoning that the boys had the benefit of his company on the return trip and that he gained some understanding of them through it. While this explanation has surface appeal, we reject it because of the unique timing and destination of the travel. Furthermore, this was the first trip of its sort made by the petitioner in over thirteen years on the bench. It is clear that the trip was, in fact, a junket subsidized by the taxpayers and the parents of the juvenile boys.

Each incident or series of incidents reviewed above speaks for itself; each is of the quality which seriously undermines the judicial office.

We therefore conclude that the foregoing actions constitute conduct prejudicial to the administration of justice which brings a judicial office into disrepute. South Dakota Constitution, Art. V, § 9. Furthermore, we conclude, as did the Commission, that censure is the appropriate sanction for this conduct.[5]

5.  Because the facts do not merit it, we do not consider whether we could impose a sanction greater than that recommended by the Commission. See In Re Diener, supra; In Re Robson, supra.

*Actions Before Effective Date of the Act.*

■ The final issue before us is whether the Commission and this court can properly consider incidents which occurred before the effective date of the Act.

We note as a preliminary matter that not all of the conduct complained of occurred before the effective date of the Act, July 1, 1973. Indeed, the petitioner's wife continued to practice before him even after the complaint against the petitioner was filed on March 22, 1974.

Other conduct, however, did take place before the July 1, 1973 date. The petitioner does not argue that the legislature did not have the power to allow the Commission and this court to consider pre-enactment behavior. He argues only that the legislature did not clearly evidence an intent that such behavior be considered and that without such evidence this statute may not be so applied.[6]

Our examination of the Act, however, reveals in its various provisions a clearly expressed intent that it is to apply to offenses predating its existence.

---

6. Petitioner thus apparently concedes that legislative schemes which are intended to regulate membership of the professions and which set up boards with authority to consider pre-enactment matters are not invalid as in conflict with the ex post facto provisions of Art. VI, § 12 of the South Dakota Constitution, or Art. I, § 10 of the United States Constitution. The ground commonly given is that such schemes are not penal in purpose but rather their intent is to protect the public from those unsuited to practice a particular profession. See In Re Craven, 1930, 178 La. 372, 151 So. 625 (lawyer); Norfolk & Portsmouth Bar Ass'n v. Drewry, 1934, 161 Va. 833, 172 S.E. 282 (lawyer); Smith v. State of California, 1964, 9 Cir., 336 F.2d 530 (professional engineer); Hollingsworth v. Board of Medical Examiners, 1961, 188 Cal.App.2d 172, 10 Cal.Rptr. 343 (doctors); Murrill v. State Board of Accountancy, 1950, 97 Cal.App.2d 709, 218 P.2d 569 (accountants). See also Keiser v. Bell, 1971, D.C.Pa., 332 F.Supp. 608, in which the court, in an apparent departure from the rationale of the cases cited above, determined that the removal of a judge was, in fact, penal in nature. The court found, however, that the particular enactment did not deprive the judge of any substantial procedural protections which he possessed before the enactment. Hence, although the law allowed for consideration of pre-enactment activities, it did not violate the ex post facto prohibition. See American Inv. Co. v. County of Beadle, 5 S.D. 410, 59 N.W. 212; In Re Scott's Estate, 1965, 81 S.D. 231, 133 N.W.2d 1.

SDCL 16-1A-10 provides that a judge is disqualified from acting as a judge while there is a felony charge pending against him. SDCL 16-1A-12 provides for suspension and removal of a judge on conviction of a felony. It cannot reasonably be said that the legislature intended that the court would be without power to remove felons from judgeships, under these portions of the Act, if the felony occurred before the effective date of the law. Such an interpretation would make a mockery of the Act, and we decline to accept it.

▮ Furthermore, it is a basic principle of statutory construction that an enactment of the legislature is to be considered as a whole. See Western Surety Co. v. Mydland, 1970, 85 S.D. 172, 179 N.W.2d 3. Thus, if retroactive impact is clearly intended for some of the provisions of an act, it seems logical to assume that the legislature intended retroactive impact for them all. "A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent." Sutherland on Statutory Construction, Vol. 2A, § 46.05.

The construction of the statute as retroactive is greatly bolstered by an appreciation that the legislature was attempting to induce reform into the judicial system through passage of the Judicial Qualifications Act. Can it reasonably be believed that the Commission created by it was to stand idle when there was work to be done? We think not.

Therefore, given the clear intent that a significant portion of the Act is to be applied retroactively and the presumption that the legislature did not create an organ of reform only so it would remain idle for a period of years we conclude that the Commission properly considered the conduct of Judge Heuermann which occurred before the effective date of the Act.[7]

Our duty, imposed by the state legislature and by the state

---

7. We have found it unnecessary to directly consider whether the statute at issue is a "remedial" statute, thus arguably requiring less evidence of legislative intent to merit retroactive application. See State v. Westling, 1964, 81 S.D. 34, 130 N.W.2d 109; Sutherland on Statutory Construction, Vol. 2, § 41.09. See also, Smith v. Fischer, 1931, 58 S.D. 510, 237 N.W. 718, distinguishing remedial from penal statutes, and see cases cited in footnote 6.

constitution, is to maintain a judiciary which is both respected and trusted. We must be vigorous in uncovering the actions of an errant judge, but we must at the same time be careful not to find error or impose punishment merely to appease a public and a bar which are now demanding more of their judiciary than ever before. We share this duty with the Commission, whose proceedings reveal to us a high degree of competence and dedication to duty. The Commission's findings and its recommendation are approved.

Judge William H. Heuermann is hereby censured for conduct prejudicial to the administration of justice which has brought his judicial office into disrepute.

It is further ordered that costs be and are hereby assessed against petitioner.

WINANS, WOLLMAN and COLER, JJ., and HANSON, Retired Justice, concur.

HANSON, Retired Supreme Court Justice, sitting for DUNN, Chief Justice, disqualified.