#25756-DG

**2011 S.D. 22**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE

FORMAL INQUIRY CONCERNING

JUDGE A. P. FULLER

* * * *

ORIGINAL PROCEEDING

* * * *

MICHAEL J. SCHAFFER
Schaffer Law Office, Prof., LLC
Sioux Falls, South Dakota　　　　　　　　　Attorneys for Judicial
　　　　　　　　　　　　　　　　　　　　　　Qualifications Commission.

JACK H. HIEB
ZACHARY W. PETERSON of
Richardson, Wyly, Wise, Sauck
 & Hieb, LLP
Aberdeen, South Dakota

 and

THOMAS J. NICHOLSON of
Nicholson & Nicholson
Sioux Falls, South Dakota　　　　　　　　　Attorneys for Petitioner
　　　　　　　　　　　　　　　　　　　　　　Judge A. P. Fuller.

* * * *

ARGUED APRIL 28, 2011

OPINION FILED **05/18/11**

#25756

GILBERTSON, Chief Justice

[¶1.]        The Judicial Qualifications Commission (Commission) has unanimously recommended to this Court that Judge A. P. "Pete" Fuller be removed or retired as a circuit court judge.  Judge Fuller has petitioned for modification or rejection of this recommendation.  At oral argument, Judge Fuller's counsel recommended a public censure and reinstatement with conditions attached to it.

[¶2.]        Upon our independent inquiry, this Court has determined that the evidence clearly and convincingly proves that Judge Fuller engaged in conduct that merits this Court ordering his retirement.  We stay this retirement if Judge Fuller consents to numerous conditions including his suspension without pay for six months.

HISTORICAL BACKGROUND

[¶3.]        In 1972, South Dakota electors approved the amendment of Article V of the South Dakota Constitution, Judicial Department.  The amendment reorganized the article, established a unified judicial system, and made many changes including "the establishment of a judicial qualifications commission."  S.D. Const. art. V, Historical Note; S.D. Const. art. V, § 9.

[¶4.]        The South Dakota Constitution Article V, § 9 provides:

> The Legislature shall provide by law for the establishment of a judicial qualifications commission which have such powers as the Legislature may provide, including the power to investigate complaints against any justice or judge and to conduct confidential hearings concerning the removal or involuntary retirement of a justice or judge.  The Supreme Court shall prescribe by rule the means to implement and enforce the powers of the commission.  On recommendation of the judicial qualifications commission the Supreme Court, after hearing, may censure, remove or retire a justice or judge for action which

-1-

> constitutes willful misconduct in office, willful and persistent failure to perform his duties, habitual intemperance, disability that seriously interferes with the performance of the duties or conduct prejudicial to the administration of justice which brings a judicial office into disrepute. No justice or judge shall sit in judgment in any hearing involving his own removal or retirement.

Pursuant to this provision, the Legislature in 1973 enacted H.B. 627, "An Act creating a commission on judicial qualifications, prescribing its powers and duties, providing means of implementing its recommendations." 1973 S.D. Sess. Laws 136. These provisions are codified in SDCL ch. 16-1A.[1] This Court prescribed rules to implement and enforce the powers of the Commission which are found in the appendix to SDCL ch. 16-1A.

[¶5.] Prior to this case, only one case has been reviewed by this Court under South Dakota Constitution Article V, § 9 and SDCL ch. 16-1A. *Matter of Heuermann,* 90 S.D. 312, 240 N.W.2d 603 (1976). Two of the issues resolved in *Heuermann* were the proper standard of proof in proceedings pursuant to SDCL ch. 16-1A and the proper standard of review of the Commission's findings of fact and recommendation. *Id.* at 315, 240 N.W.2d at 605.

[¶6.] As to the appropriate standard of proof in proceedings under SDCL ch. 16-1A this Court held:

> We note that it would be inapposite to require proof "beyond a reasonable doubt" as this is not a criminal prosecution. Proof by

---

1. SDCL 16-1A-9 provides:

   > Based upon its findings the Commission on Judicial Qualifications shall make a recommendation either that no further action be taken or that the judge investigated be censured, suspended, removed, or retired.

a mere preponderance of the evidence is also inapposite because of the severity of the sanction which can be imposed. We conclude that the proper standard of proof is by "clear and convincing evidence." Such a standard provides adequate protection for the party subject to charges, but at the same time does not demand so much evidence that the ability of the Commission and this court to effectively oversee the judiciary is impaired.

*Id.* at 317, 240 N.W.2d at 605.

[¶7.]　　　In considering the proper standard of review of the Commission's findings and recommendation, this Court recognized that it "had an obligation to undertake 'an independent evaluation of the evidence and the recommendation of the Commission.'" *Id.* at 317, 240 N.W.2d at 606 (quoting *In re Hanson,* 532 P.2d 303, 308 (Alaska 1975)).

The rationale for requiring an independent evaluation of the evidence and recommendation is that the Act puts the burden of imposing the sanction squarely on the Supreme Court; the Commission has power only to recommend. With the power to impose a punishment comes the concomitant obligation to conduct an independent inquiry into the evidence to determine whether that evidence merits imposition of the sanction recommended.

Thus, in every case brought to this court on a recommendation from the Commission, we must determine whether the evidence clearly and convincingly proves that the petitioner engaged in conduct which, upon our independent inquiry, merits the imposition of the sanction recommended.

*Id.* (footnote omitted).

[¶8.]　　　This Court's decision in *Heuermann* did not address the weight or deference given to Commission credibility determinations. We agree with the Supreme Court of Washington that when conducting our independent inquiry to determine whether the evidence clearly and convincingly merits the imposition of

the recommended sanction, "[a]lthough we give considerable weight to the credibility determinations of the Commission and serious consideration to the Commission's recommended sanctions, the ultimate decisions of whether and how to discipline an errant judge falls to the Supreme Court." *In re Disciplinary Proceeding Against Eiler,* 236 P.3d 873, 876 (Wash. 2010).

[¶9.] With these principles in mind we turn to the case before us.

FACTS

I.

[¶10.] In May 2010, Glen Brenner, the Pennington County State's Attorney, Steve Allender, the Rapid City Chief of Police, and Don Holloway, the Pennington County Sheriff, filed a complaint with the Commission alleging that Judge Fuller referred to Rapid City police officers as a "bunch of racists" during a police officer's testimony at an April 28, 2010, juvenile proceeding. The complaint alleged[2] that Judge Fuller's comment was inappropriate and violated Canons 1, 2, and 3 of the South Dakota Code of Judicial Conduct. SDCL app. 16-2.

---

2. A complaint in a judicial disciplinary proceeding must allege facts which would demonstrate:
   1) a violation of the Judicial Code,
   2) willful misconduct in office,
   3) habitual intemperance,
   4) disability that seriously interferes with the performance of the judge's duties, or
   5) violation of any constitutional provisions or statutes or conduct that is prejudicial to the administration of justice and brings a judicial office into disrepute.

   Rule III(2)(b), Rules of Procedure of the Judicial Qualifications Commission, SDCL app. 16-1A.

[¶11.] The Commission forwarded the complaint to Judge Fuller and requested a detailed response. By letter dated June 28, 2010, Judge Fuller simply responded, "[t]he allegation is correct."

[¶12.] The Commission elected to investigate the complaint filed against Judge Fuller and issues concerning Judge Fuller's demeanor. Attorney Dave Nelson, then counsel for the Commission, was directed to conduct the investigation. Nelson interviewed a number of individuals including lawyers and court personnel. After Nelson submitted his investigatory report, the Commission voted to institute formal proceedings to "inquire into the charges against the judge." Rule III(6), Rules of Procedure of the Judicial Qualifications Commission, SDCL app. 16-1A. A formal complaint, incorporating by reference Nelson's report, was served upon Judge Fuller on September 9, 2010.

[¶13.] On September 30, 2010, the Commission held a hearing on its order to show cause why Judge Fuller should not be suspended with compensation, as mandated by the rules of the Judicial Qualifications Commission, during the pendency of these proceedings. Rule III(11), Rules of Procedure of the Judicial Qualifications Commission, SDCL app. 16-1A. Judge Fuller was present and proceeded without counsel although he understood that he had a right to have counsel present. Following the show-cause hearing the Commission voted unanimously to recommend to this Court that Judge Fuller be suspended with compensation. Ultimately this Court entered an order suspending Judge Fuller with compensation during the pendency of these proceedings.

[¶14.]     The formal hearing was held December 13, 2010.  Prior to the hearing, Commission counsel and Judge Fuller's counsel stipulated that the testimony and exhibits received at the show-cause hearing would be received into evidence at the formal hearing and it would not be necessary to recall those witnesses.

[¶15.]     Following the hearing, the Commission entered 90 detailed findings of fact and ten conclusions.  It unanimously recommended to this Court that "Judge Fuller be removed or retired as a circuit judge" based upon Judge Fuller's "pattern of improper activity and the effect that that improper activity has had on others, including court personnel, attorneys, litigants, and on the judicial system itself."

II.

[¶16.]     Judge Fuller was born on February 17, 1943.  He received a J.D. from the University of South Dakota School of Law in 1968.  Judge Fuller practiced law in Chamberlain, South Dakota for three years.  He moved to Lead, South Dakota in 1971 where he practiced law for 32 years.  As a lawyer he served on the Commission and was its Chair.  He was appointed to the Seventh Circuit bench in March 2003.  Judge Fuller was elected to an eight-year term following a contested election in 2006.  Until this proceeding Judge Fuller has never been the subject of formal judicial discipline.

[¶17.]     The evidence in this case reveals a pattern of misconduct that began when Judge Fuller assumed the bench and continued throughout his entire tenure on the bench.  While Judge Fuller disputes some of the allegations that led to this proceeding, our focus is on the numerous allegations that he admitted occurred.  They are also the most serious.

## A.

[¶18.]	In 2004, Judge Fuller was assigned to the Fall River County judicial rotation.  Two female deputy clerk of courts, one of whom had over 40 years of experience as a clerk, refused to go into Judge Fuller's courtroom because of his degrading comments, swearing, anger, and disrespect.  Clerk of Courts Carol Foster assumed courtroom duties.  Virtually every time she was in open court, Judge Fuller, from the bench and with the public present, would swear using terms such as "the goddamn clerk," "the goddamn schedule," and "the goddamn calendar." While Judge Fuller would laugh and joke about the comments, Foster found them belittling, not humorous.  Foster also observed Judge Fuller swear at an attorney and tell another female attorney during the course of a public hearing "to shut the damn statutes, he had already made his decision and he didn't need to be told what the law was."  Foster also heard Judge Fuller, who was in his chambers, screaming and using the "F" word.  While Judge Fuller denied using profanity, he admitted that he treated Foster and her staff rudely and disrespectfully.

## B.

[¶19.]	In May 2007, Judge Fuller was conducting a jury trial in Custer County.  Judge Fuller told the clerk of courts that he did not need her services in the courtroom.  When she told Judge Fuller it was necessary for "appeal purposes, exhibit marking, for his benefit," "that set him off."  Later, when the clerk was explaining the practical logistics of feeding the jury in Custer before the beginning of tourist season, Judge Fuller turned around, pointed his finger at her, became red faced, raised his voice, and told her "you will do as you are told."  The clerk had

"never felt as belittled as I did [that] day." The clerk told the court administrator and presiding judge that she preferred not to work with Judge Fuller, but would do so due to the rotation and her job requirements. Judge Fuller, however, was never put back into the regular rotation for either Custer or Fall River counties.

C.

[¶20.] Attorney Barton Banks practiced in Rapid City for 19 years and had a cordial relationship with Judge Fuller when Judge Fuller was an attorney. In Banks' first case in front of Judge Fuller in October 2007, Judge Fuller, in chambers, commented that Banks was "an asshole." Banks assumed the comment was in jest. Later, in response to a comment Banks made in the courtroom, Judge Fuller during the course of a court proceeding and from the bench "gave [Banks] the bird."[3] Banks' client seated next to Banks at counsel table saw the gesture and was greatly concerned.

[¶21.] Banks lost the case and appealed to the Supreme Court where he received a favorable ruling. On remand, Judge Fuller believed the Supreme Court

---

3.  Giving the "bird" or "finger" is an obscene or vulgar gesture. *In re S.J.N-K.,* 2002 S.D. 70, ¶ 14, 647 N.W.2d 707, 712; *Spruance v. Comm' on Judicial Qualifications,* 532 P.2d 1209, 1222 (Cal. 1975).

> The extended middle finger or digitus impudicus is a phallic symbol. Its use as a semiotic insult is of ancient origin. Diogenes is reported to have insulted Demosthenes with it. Bauml and Bauml, Dictionary of Gestures, Scarecrow Press (1975) p.71.

*People of City of Oak Park v. Smith,* 262 N.W.2d 900, 902 n.1 (Mich. 1977).

was wrong and did not follow this Court's directive. Banks "found myself in a very awkward position with my client who I just convinced to try this case to the court." Banks appealed, "on my own dime," and the case was settled before briefing. Banks no longer practices before Judge Fuller; he submits affidavits to recuse Judge Fuller because of the lack of predictability in Judge Fuller's court.

[¶22.] Other attorneys in civil cases expressed concern over Judge Fuller's lack of courtesy and respect. One described how Judge Fuller became so irritated with opposing counsel in March 2008, that, "in front of the jury," he expressed his displeasure. When the jury was not present, Judge Fuller told opposing counsel "a number of times that when he [Judge Fuller] practiced law, he considered the judge an enemy, and so, don't let me push you guys around."

[¶23.] Another attorney described a motion hearing before Judge Fuller. Judge Fuller's tone and demeanor were "impatient, it was abrupt, it was condescending, it was rude." While the attorney found Judge Fuller's demeanor, "not in keeping with the finest standards of judicial decorum," he also found his behavior "an aberration, from my perspective, based upon my experience with Judge Fuller." His clients, however, believed that they had not and would not be treated fairly by Judge Fuller and were very upset.

[¶24.] In another civil proceeding, Judge Fuller initiated ex parte contact with one of the attorneys on more than one occasion to inform the attorney of a case adverse to his position. The attorney felt that he had been placed in an awkward position. The information that Judge Fuller provided was later given to the other attorneys involved in the case.

D.

[¶25.] Judge Fuller presided over a recent juvenile rape adjudication. The juvenile defendant was 14 years old while the victim was 11 years old. The case came down to a "he said--she said" case. Judge Fuller directed the alleged defendant and victim to submit to polygraphs. When the lawyers refused to facilitate the polygraphs, Judge Fuller became angry and told them it was unfair for him to make a decision based on the testimony he heard in court.[4] Judge Fuller denies actually entering an order on the polygraph, but admits his conduct was improper.

E.

[¶26.] In 2010, court services officers (CSOs) became increasingly concerned over Judge Fuller's offhand comments and demeanor in the courtroom, failure to respond to safety issues in his crowded courtroom, and handling the docket too quickly. Judge Fuller, according to CSO Tonia Fischer, changed in March 2010, and became disrespectful, demeaning, and rude. Judge Fuller's comments to Fischer were so harsh that a juvenile and his parents apologized to her for Judge Fuller's actions. When safety concerns were expressed over having 100 people in his courtroom during juvenile proceedings, Judge Fuller dismissed them "until something happens."

---

4. This Court has repeatedly held that polygraph tests are not admissible in the courts of this state. *Sabag v. Cont' South Dakota,* 374 N.W.2d 349, 353 (S.D. 1985); *State v. Waff,* 373 N.W.2d 18 (S.D. 1985); *State v. Muetze,* 368 N.W.2d 575, 588 (S.D. 1985); *State v. Watson,* 248 N.W.2d 398, 399 (S.D. 1976); *State v. O'Connor,* 86 S.D. 294, 301, 194 N.W.2d 246, 250 (1972).

[¶27.] In addition, Judge Fuller admits that in the hallway going into the courtroom for juvenile proceedings, he has told state's attorneys and CSOs that "[i]t's time for me to see my little peckerheads." While Judge Fuller assumed the comment would be taken as a joke, a mother overheard it and questioned if her child could get a "fair shake" from Judge Fuller.

## F.

[¶28.] In addition to referring to juveniles as "peckerheads," Judge Fuller admits that he made disparaging remarks about women in the legal profession, Native Americans, and law enforcement. This proceeding began after he referred to law enforcement as a "bunch of racists" during a legal proceeding in April 2010.

[¶29.] During a break in a legal proceeding, Judge Fuller commented to a legal intern that the legal profession was better off before women belonged and the profession should go back to the way it was in 1916 or 1918. While the intern believed Judge Fuller was joking, she found the comments offensive.

[¶30.] The walls in Judge Fuller's courtroom are lined with photographs and artwork. In order to accommodate the audio-visual system, if needed in his courtroom, Judge Fuller would remove three pieces depicting Native Americans. When the trial was over, Judge Fuller would hang the artwork back on the wall. When doing so he admits "saying, again in a smart aleck deal, this is where I hang my Indians." Judge Fuller admits that the remark was completely inappropriate and claims that he apologized. He testified that the pictures of Native Americans in his courtroom were to demonstrate to Native American juveniles respect for their leaders.

G.

[¶31.] Glen Brenner, the Pennington County State's Attorney, filed the initial complaint in this case. While Brenner had a good relationship with Judge Fuller, Judge Fuller in the hallway once expressed "a philosophical belief" that "why must the wind always be at the back of the state and in the face of the defendant." During regular staff meetings in Brenner's office, deputy state's attorneys expressed their frustration with Judge Fuller and their belief that they were not treated with respect in his courtroom because of their position within government. By the time of the initial show-cause hearing, Judge Fuller admitted that the deputy state's attorneys systematically filed affidavits to recuse him and Judge Fuller was taken off all criminal cases.

DUE PROCESS

[¶32.] In his brief, Judge Fuller contends that he was not afforded due process during the Commission's proceedings because he did not receive sufficient notice of the specific charges or allegations against him. Although he did not pursue the matter at oral argument, we nevertheless address it because the complaint is the basis for all proceedings against him and the issue may arise in the future.

[¶33.] On September 9, 2010, Judge Fuller was served with the original complaint in this matter which alleged that he violated Canons 1A, 2A, 3B(4), 3B(5), and 3B(7) of the Code of Judicial Conduct. SDCL app. 16-2. Attached to the complaint and incorporated into it by reference was the Nelson investigative report that detailed witnesses and their allegations. Judge Fuller contends, however, that

any allegation or evidence not specifically set forth in the body of the complaint could not be used by the Commission.

[¶34.] We find our analysis in *In re Discipline of Russell,* 2011 S.D. 17, __ N.W.2d __, dispositive. The disciplinary charge must "adequately inform" the respondent of the nature of the charge against him and "is sufficient if it enables a person of common understanding to know what is intended from the language contained and if it apprises a [respondent] with reasonable certainty of the accusation against him so that he may prepare his defense." *Id.* ¶ 35 (quoting *In re Kunkle,* 88 S.D. 269, 274-75, 218 N.W.2d 521, 524 (1974)).

> [M]ost courts usually have not allowed errors in prescribed notice procedures to nullify the validity of investigations and hearings conducted by disciplinary organizations. The majority view holds that virtually no notice is required by the due process clause in investigatory proceedings. This view does not extend to adjudicative proceedings. Even there, though, due process demands only the amount of notice necessary to give a judge a general idea of the charges against him.

Jeffrey M. Shaman, et al., Judicial Conduct and Ethics § 13.10B (4th ed. 2007).

## APPROPRIATE SANCTION

[¶35.] The Commission concluded that Judge Fuller violated the following Canons of the South Dakota Code of Judicial Conduct:

Canon 1A:

> An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity, impartiality and independence of the judiciary will be preserved. The provisions of this Code are to be construed and applied to further that objective.

#25756

Canon 2A:

A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

Canon 3B:

(4) A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, and of staff, court officials and others subject to the judge's direction and control.

(5) A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, disability or age, and shall not permit staff, court officials and others subject to the judge's direction and control to do so.

* * *

(7) A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to Law. A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding[.]

Canon 4A:

A judge shall conduct all of the judge's extra-judicial activities so that they do not:

(1) cast reasonable doubt on the judge's capacity to act impartially as a judge;

(2) demean the judicial office, or

(3) interfere with the proper performance of judicial duties.

SDCL app. 16-2.

[¶36.] These Canons govern judicial conduct in South Dakota. However, for this Court to consider censure, suspension,[5] retirement or removal, those actions are governed by the South Dakota Constitution. The South Dakota Constitution Article V, § 9 states, in part:

> On recommendation of the judicial qualifications commission the Supreme Court, after hearing, may censure, remove or retire a justice or judge for action which constitutes *willful misconduct* in office, willful and persistent failure to perform his duties, habitual intemperance, disability that seriously interferes with the performance of the duties or *conduct prejudicial to the administration of justice which brings a judicial office into disrepute.*

(Emphasis added.)

[¶37.] Judge Fuller's acts can be analyzed under either the prohibition against "willful misconduct" or "conduct prejudicial to the administration of justice which brings a judicial office into disrepute." In construing a nearly identical constitutional clause, the Supreme Court of California held that for a judge to commit willful misconduct, the acts must be committed in "bad faith." *Kloepfer v. Comm'n on Judicial Performance,* 782 P.2d 239, 241 (Cal. 1989) (citing *McCullough v. Comm'n on Judicial Performance,* 776 P.2d 259 (Cal. 1989)). Black's Law Dictionary 139 (6th ed. 1990) defines "bad faith" as:

> The opposite of "good faith," generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some

---

5.  While suspension is not specifically mentioned in South Dakota Constitution Article V, § 9, it is included by implication since suspension is a lesser sanction to the sanctions of retirement or removal, both of which are permanent in nature. *See* SDCL 16-1A-9 (Commission can recommend censure, suspension, removal or retirement).

contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.

To establish "prejudicial conduct" however, does not require the presence of bad faith. "It occurs when a judge, though acting in good faith, engages in conduct which adversely affects public opinion of the judiciary." *Kloepfer,* 782 P.2d at 241. The Commission's findings do not declare Judge Fuller guilty of bad faith. We focus, therefore, on the "conduct prejudicial" clause of South Dakota Constitution Article V, § 9. Several legal principles set forth below are appropriate to our examination of this case.

[¶38.] "The power which the people of this state have entrusted to a circuit court judge affects the people's lives, welfare and property to no small extent." *Cummings v. Mickelson,* 495 N.W.2d 493, 496 (S.D. 1993). As such:

> Our duty, imposed by the state legislature and by the state constitution, is to maintain a judiciary which is both respected and trusted. We must be vigorous in uncovering the actions of an errant judge, but we must at the same time be careful not to find error or impose punishment merely to appease a public and a bar which are now demanding more of their judiciary than ever before.

*Heuermann,* 90 S.D. at 321, 240 N.W.2d at 608.

[¶39.] The preamble to the South Dakota Code of Judicial Conduct eloquently states:

> Our legal system is based on the principle that an independent, impartial, fair and competent judiciary will interpret and apply the laws that govern us. The role of the judiciary is central to American concepts of justice and the rule of law. Intrinsic to all sections of this Code are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to enhance and maintain confidence in our legal system. The judge is an arbiter of facts and law for the

resolution of disputes and a highly visible symbol of government under the rule of law.

SDCL app. 16-2.

[¶40.]     South Dakota's judicial system cannot function properly unless judges maintain the highest standards. *See* Rule II(3), Rules of Procedure of the Judicial Qualifications Commission, SDCL app. 16-1A. As we noted in an attorney discipline case:

> The citizens of this state and those non-residents who seek relief in our Courts have a right to expect that as far as humanly possible, the fact finders, be they a jury or a judge will attempt to find the true facts and correctly apply the law. Witnesses take oaths to tell the truth. Jurors take oaths to do their duty. Judges take an oath consistent with their calling. All of this crumbles should an attorney [or a judge] violate his oath[.]

*In re Discipline of Ortner,* 2005 S.D. 83, ¶ 40, 699 N.W.2d 865, 877.

[¶41.]     To strive for judicial integrity is the work of a lifetime. That should not dissuade the profession. The difficulty of the undertaking does not mean we should refrain from the attempt. Explicit standards of judicial conduct provide essential guidance for judges in the proper discharge of their duties and the honorable conduct of their office.

*Republican Party of Minn. v. White,* 536 U.S. 765, 794, 122 S. Ct. 2528, 2545, 153 L. Ed. 2d 694 (2002) (Kennedy, J., concurring). Our legal system can function "only so long as the public, having confidence in the integrity of its judges, accepts and abides by judicial decisions." *In re Winton,* 350 N.W.2d 337, 340 (Minn. 1984).

> A judge has a position of power and prestige in a democratic society espousing justice for all persons under law. The role of a judge in the administration of justice requires adherence to the highest standard of personal and official conduct. Of those to whom much is committed, much is demanded. A judge, therefore, has the responsibility of conforming to a higher standard of conduct than is expected of lawyers or other persons in society.

*Id.* To paraphrase our decision in an attorney discipline case, "[e]ach day of a [judge's] life demands that these requirements be met anew." *See In re Discipline of Eicher,* 2003 S.D. 40, ¶ 25, 661 N.W.2d 354, 363.

[¶42.] "The single overriding rationale behind our system of judicial discipline is the preservation of public confidence in the integrity and the independence of the judiciary." *In re Mathesius,* 910 A.2d 594, 608 (N.J. 2006).

> Discipline is not imposed to punish the individual judge. Rather, the purpose of judicial discipline, like the purpose of the Code of Judicial Conduct, is to protect our court system and the public from misconduct. Discipline is designed to restore and maintain the dignity, honor, and impartiality of the judicial office.

*In re Disciplinary Proceedings Against Ziegler,* 750 N.W.2d 710, 721 (Wis. 2008).

[¶43.] The Supreme Court of Nebraska has recognized the purpose of sanctions in cases of judicial discipline:

> The purpose of sanctions in cases of judicial discipline is to preserve the integrity and independence of the judiciary and to restore and reaffirm public confidence in the administration of justice. The discipline we impose must be designed to announce publicly our recognition that there has been misconduct; it must be sufficient to deter respondent from again engaging in such conduct; and it must discourage others from engaging in similar conduct in the future. Thus, we discipline a judge not for purposes of vengeance or retribution, but to instruct the public and all judges, ourselves included, of the importance of the function performed by judges in a free society. We discipline a judge to reassure the public that judicial misconduct is neither permitted nor condoned. We discipline a judge to reassure the citizens of Nebraska that the judiciary of their state is dedicated to the principle that ours is a government of laws and not of men. *See Disciplinary Proceeding Against Buchanan,* 100 Wash. 2d 396, 669 P.2d 1248 (1983); *Matter of Ross,* 428 A.2d 858 (Me. 1981).

*In re Kneifl,* 351 N.W.2d 693, 700 (Neb. 1984).

[¶44.]      This Court is charged by the South Dakota Constitution with the responsibility for judicial discipline.  In so doing we keep in mind the guidance from the cases cited above.  Judge Fuller in his presentation to this Court pointed out that he has already suffered considerable public notoriety and humiliation as a result of these proceedings.  While that may be the case we have consistently refused to recognize such claims as a basis for leniency from this Court.  The Constitution charges this Court and not the media, public comment, or any third party with fashioning an appropriate sanction.  *In re Discipline of Wilka,* 2001 S.D. 148, ¶ 17, 638 N.W.2d 245, 249-50 (citing *In re Discipline of Dorothy,* 2000 S.D. 23 ¶ 40, 605 N.W.2d 493, 505; *In re Discipline of Hopewell,* 507 N.W.2d 911, 917 (S.D. 1993)).

[¶45.]      Many letters of support for Judge Fuller from attorneys make the point that he is no worse than some other judges who the authors have appeared in front of.  We addressed such an argument in *Eicher,* 2003 S.D. 40, ¶ 51, 661 N.W.2d at 370:

> arguments that [the judge] is no worse than the supposed bottom of the barrel that have been [elected or appointed to a judgeship] all fail to pass muster.

The Judicial Canons recognize no "lowest common denominator" standard of judicial conduct or defense.

[¶46.]      All judges are human and are capable of making a misstatement or mistake especially in the heat of a court proceeding.  Such is not the case here.  Judge Fuller's misconduct was continual throughout his tenure on the bench.  We have made a strong distinction in attorney disciplinary cases between misconduct

which was isolated and committed in the heat of a trial versus intentional misconduct which was continual and not provoked. *See Eicher,* 2003 S.D. 40, ¶ 29, 661 N.W.2d at 364; *Hopewell,* 507 N.W.2d at 917.

[¶47.] It took significant courage for counsel who appeared in front of Judge Fuller, and could possibly again, to come forward and testify before the Commission about his conduct. The same is true for law enforcement. Likewise, UJS employees who were verbally abused and bullied by Judge Fuller also confronted him at the Commission's hearings to tell what they had endured. The distinguished panel of judges, attorneys, and lay people who make up the Commission and serve without pay, in the course of their lengthy constitutional obligations, weighed the evidence and arrived at the difficult recommendation to retire or remove a sitting judge for the first time in this State's history.

[¶48.] We conclude that the actions of Judge Fuller by clear and convincing evidence violate Canons 1A, 2A, 3B(4), 3B(5), 3B(7) and 4A. He concedes as much. We further conclude the actions of Judge Fuller by clear and convincing evidence violate South Dakota Constitution Article V, § 9 in that they constitute "conduct prejudicial to the administration of justice which brings a judicial office into disrepute."

[¶49.] This misconduct has demeaned Judge Fuller and the judicial position he holds. Judge Fuller now asks for a second chance from this Court. He asks to resume his judicial duties with an emphasis on correcting his past misconduct and mistakes. We have no reason not to believe Judge Fuller is sincere in his apology for his past misconduct and his intention to try to rectify the situation. Judge

Fuller has presented to this Court testimony and letters of recommendation attesting to his fine attributes. We respect those opinions from eminent members of the bar. However, Judge Fuller has maligned the reputation of South Dakota's judiciary, has insulted individual lawyers, has uttered insensitive racial and sexist jokes, has conducted himself on the bench with unconscionable arrogance, has used abusive language, has rudely mistreated employees of the UJS, and has flippantly from the bench referred to law enforcement as a "bunch of racists" with no evidentiary basis to do so.

[¶50.]        Judge Fuller has not only damaged his judicial office but those of every judge in this state. Each judge's decisions, judgments, and decrees are not enforced by armies or by force. They are chiefly enforced by the voluntary compliance of our citizens through their respect for the rule of law. Judge Fuller's misconduct makes it more difficult for every judge in this state to maintain that respect for our courts and thus our ability to effectively resolve society's legal disputes.

> Courts, in our system, elaborate principles of law in the course of resolving disputes. The power and the prerogative of a court to perform this function rest, in the end, upon the respect accorded to its judgments. The citizen's respect for judgments depends in turn upon the issuing court's absolute probity. Judicial integrity is, in consequence, a state interest of the highest order.

*Republican Party of Minn.,* 536 U.S. at 793, 122 S. Ct. at 2544 (Kennedy, J., concurring).

[¶51.]        During oral argument, Judge Fuller candidly admitted his wrongdoing. This implies he is capable of rehabilitation and overcoming his personality traits that got him into this trouble in the first place. Judge Fuller has no prior judicial

disciplinary complaints and at one point actually served as the Chair of the Judicial Qualifications Commission. Prior to becoming a judge, he had a lengthy and honorable career as an attorney. We keep in mind our admonition of the consequences of a proceeding such as this on a person who is entrusted with special authority to engage in their profession:

> [T]he seriousness of the outcome of the hearing on the [judge's] right to continue to practice his profession is obvious: "It has been repeatedly held in this state that the revocation of a license of a professional man carries with it dire consequences. It not only involves necessarily disgrace and humiliation, but it means the end of his professional career."

*In re Schram,* 414 N.W.2d 31, 35 (S.D. 1987) (quoting *Smith v. Dept. of Registration,* 106 N.E.2d 722, 728 (Ill. 1952)).

[¶52.]     Our judicial oath and South Dakota Constitution Article V, § 9, place the duty squarely upon this Court to determine what is appropriate discipline in this matter. Judge Fuller's conduct is prejudicial to the administration of justice which has brought his judicial office into disrepute in violation of South Dakota Constitution Article V, § 9. Our research, along with that of counsel for both sides, has identified dozens of cases from other states that deal with this type of misconduct. The results are very mixed. Some states opt for a public censure, others for a suspension, and a few for removal. However, all are fact specific and thus none completely fall within the factual setting of this case. Thus, while mindful of these cases, in the end it falls upon us to fashion an appropriate sanction in this case.

[¶53.]     The Nebraska Supreme Court recognized:

> In the final analysis, however, any effort to design the appropriate discipline in this matter by comparing it with that imposed in any case by any other jurisdiction is of limited value. Although analyzing what other jurisdictions have done is instructive, the responsibility of defining and enforcing proper conduct for Nebraska judges falls upon this tribunal. Neb. Const. art. V, § 30(2), and § 24-723. *See, also,* Neb. Const. art. V, § 1, vesting in this court general administrative authority over all courts.

*Kneifl,* 351 N.W.2d at 700.

[¶54.] In keeping with our constitutional duty and after a full and independent review of the record, it is:

> ORDERED: That for his misconduct Circuit Judge A. P. Fuller is involuntarily retired effective 30 days from the date this opinion is filed. It is further,
>
> ORDERED: That if Circuit Judge A. P. Fuller consents in writing to the following conditions within 30 days the above order requiring involuntary retirement will be stayed:
>
> 1. Indefinite probation, under such supervision and conditions as may be set from time to time by the Supreme Court;
>
> 2. Six months additional suspension from judicial office without pay;
>
> 3. During the suspension period, Judge Fuller will:
>
>    a. Successfully complete, at his own expense, an accredited course on judicial ethics, approved in advance by the Supreme Court;
>
>    b. Resume his behavioral therapy until it is successfully completed, as verified by his therapist;
>
> 4. As a condition to reinstatement after this suspension, Judge Fuller must reimburse the Unified Judicial System for all expenses (including attorney's fees) the Judicial Qualifications Commission incurred in connection with this matter in an amount to be determined by the Supreme Court;
>
> 5. During the probationary period, any violation of the Code of Judicial Conduct or failure to timely complete any of the above conditions, as determined by the Supreme Court, will constitute a

> violation of probation, and the stay will be lifted and Judge Fuller will be involuntarily retired.
>
> ORDERED: Upon completion of these conditions and Circuit Judge A. P. Fuller's return to the bench, the Supreme Court shall randomly poll judges, attorneys, court personnel, and others to ascertain their opinion of how Judge Fuller is conducting himself.

[¶55.] In our sanction of today we determine that Judge Fuller is capable of rehabilitation. "History is replete with those who have overcome a weakness or character flaw and risen to what Attorney at Law Abraham Lincoln declared to be the 'better angels of our nature.'" *In re Discipline of Laprath,* 2003 S.D. 114 ¶ 87, 670 N.W.2d 41, 66 (citing *Eicher* 2003 S.D. 40, ¶ 29, 661 N.W.2d at 371).

[¶56.] This is the first time in its 121 year history that this Court has been called upon to render judicial discipline of this severity upon one of the judges of this State. We hope this Court's words do not go unheeded and will result in a judicial future free of this type of misconduct.

[¶57.] KONENKAMP, ZINTER, MEIERHENRY, and SEVERSON, Justices, concur.