#26996-a-DG

**2015 S.D. 2**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                 Plaintiff and Appellee,

   v.

EUGENE EDWARD MARTIN,                  Defendant and Appellant.


* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JOSEPH NEILES
Judge

* * * *

MARTY J. JACKLEY
Attorney General

KIRSTEN E. JASPER
Assistant Attorney General
Pierre, South Dakota                   Attorneys for plaintiff
                                  and appellee.


MICHAEL G. MILLER
Minnehaha County Public
 Defender's Office
Sioux Falls, South Dakota              Attorneys for defendant and
                                  appellant.

* * * *

CONSIDERED ON BRIEFS ON
JANUARY 12, 2015
OPINION FILED **01/28/15**

#26996

GILBERTSON, Chief Justice

[¶1.] Eugene Edward Martin appeals his conviction on one count of first-degree murder and sentence of life without the possibility of parole for the premeditated killing of Robert Thunderhawk. Martin argues that the circuit court erroneously admitted into evidence a recording of a 911 call and allowed two officers to testify about several out-of-court statements made by Martin. Martin also argues that there is insufficient evidence in the record for a jury to have concluded that Martin acted with premeditation. Consequently, Martin asks us to reverse and remand with an order directing the circuit court to enter a judgment of acquittal or schedule a new trial. We affirm.

## Facts and Procedural History

[¶2.] In May 2012, Martin, who had been homeless for several years, was living at a campsite in a drainage plain located in an undeveloped area of Sioux Falls. Clint Lawrence Cottonwood lived at his own campsite nearby. On the evening of May 2, 2012, Martin, Martin's girlfriend, Cottonwood, and Thunderhawk were drinking and socializing at Martin's campsite. Martin's girlfriend eventually left, and Martin, Thunderhawk, and Cottonwood fell asleep. The drinking resumed after they awoke the next morning.

[¶3.] Eventually, Thunderhawk began commenting about Martin's girlfriend's breasts. Martin became angry and attacked Thunderhawk, striking him with his fists. Although Cottonwood averted his eyes from the attack, he heard what he described as a "smack, smack" sound and then eventually "dink, dink, dink." At that time, Cottonwood saw Martin—completely unclothed and wielding a

-1-

shovel—standing over Thunderhawk. Martin put his clothes back on and sat down in silence. Martin and Cottonwood sat there for some time, continuing to drink beer, until Cottonwood left to buy more. Rather than buy more beer, however, Cottonwood called his friend Kevin Skogstad. Cottonwood relayed the circumstances of the killing to Skogstad, and the two called 911.

[¶4.] Police officers arrived at the scene and discovered Thunderhawk's body at Martin's campsite, partially hidden under a tarp. Although Martin was sitting in a chair approximately eight feet away from where the victim lay, Martin claimed not to see the victim's body or the tarp. A shovel with a broken handle was located on the ground next to Martin's chair. The officers arrested Cottonwood and Martin, who were transported to the police station and interviewed by law enforcement officers. While alone in an interview room, Martin appeared to clean his fingernails and legs and said, "I know you are snitching." The following morning, at Martin's campsite, law enforcement located a long-handled shovel—matching a description given by Cottonwood—standing next to a small, freshly dug, trench.

[¶5.] A jury convicted Martin of first-degree murder, and the circuit court sentenced Martin to a term of life without the possibility of parole on January 13, 2014.[1] Martin raises two issues in this appeal:

> 1. Whether Cottonwood's out-of-court statements were inadmissible hearsay that should have been excluded.
>
> 2. Whether there was sufficient evidence of premeditation to sustain the jury's guilty verdict for first-degree murder.

---

1. Cottonwood was also charged as a co-defendant, but pleaded guilty to aiding and abetting first-degree manslaughter in accordance with a plea agreement.

## Analysis and Decision

[¶6.]      1.   *Whether Cottonwood's out-of-court statements were inadmissible hearsay that should have been excluded.*

[¶7.]      Our review of a circuit court's evidentiary ruling follows a two-step analysis: "first, to determine whether the trial court abused its discretion in making an evidentiary ruling; and second, whether this error was a *prejudicial error* that 'in all probability' affected the jury's conclusion." *Supreme Pork, Inc. v. Master Blaster, Inc.*, 2009 S.D. 20, ¶ 59, 764 N.W.2d 474, 491. We recently summarized the abuse of discretion standard in *Gartner v. Temple*:

> An abuse of discretion is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable. We do not determine whether we would have made the same decision as the circuit court. Rather, our function in reviewing matters which rest in the discretion of the trial court is to protect litigants from conclusions which exceed the bounds of reason.

2014 S.D. 74, ¶ 7, 855 N.W.2d 846, 850 (citations omitted) (internal quotation marks omitted).

[¶8.]      Martin argues that the circuit court erred in admitting hearsay evidence in three instances: (1) a recorded 911 call in which Skogstad repeated statements made by Cottonwood, (2) testimony of Officer Stevens stating that Cottonwood told him that Martin "finished [the victim] off with a shovel[,]" and (3) testimony of Detective Olson stating that Cottonwood and Martin discussed how to dispose of the victim's body.[2] "'Hearsay' is a statement, other than one made by the

---

2.   In his brief to this Court, Martin also claims it was error for the circuit court to overrule his objection to Detective Olson's testimony relaying Cottonwood's

(continued . . .)

declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." SDCL 19-16-1(3) (Rule 801(a) to (c)). Hearsay is generally not admissible. SDCL 19-16-4 (Rule 802). However, "[c]ourts have discretion to allow an ordinarily inadmissible inquiry when an adversary 'opens the door' to that line of inquiry." *State v. Buchholtz*, 2013 S.D. 96, ¶ 12, 841 N.W.2d 449, 454. In such a case, the party who "'opens the door' to admission of evidence . . . may not challenge the admission of that evidence." *Veith v. O'Brien*, 2007 S.D. 88, ¶ 27, 739 N.W.2d 15, 24.

[¶9.]        Martin first argues that portions of the testimony of Officer Stevens—one of the officers who responded to the 911 call and spoke with Cottonwood at the scene—were inadmissible hearsay. Specifically, Martin objects to the circuit court permitting Officer Stevens to testify that Cottonwood told him that "[Martin] finished [the victim] off with a shovel." An examination of the trial transcript surrounding this statement, however, reveals that Martin's defense counsel opened the door for this testimony. On cross-examination, the following exchange took place between Martin's defense counsel and Officer Stevens:

> **[Defense Counsel]**: Now, when you first came into contact with Cottonwood, he immediately said that he had killed a man and you want to handcuff me?
>
> **[Officer Stevens]**: Yes.

_____

(. . . continued)

description of the two shovels. The circuit court overruled Martin's objection without comment. Even if we were to agree with Martin that the circuit court abused its discretion in doing so—a conclusion we do not reach—Martin has not attempted to explain how the inclusion of this testimony is prejudicial. Therefore we consider this argument waived and do not address it.

> **[Defense Counsel]**: Cottonwood described to you he had gotten into an argument with [the victim] and that he punched him once?
>
> **[Officer Stevens]**: Yes.
>
> **[Defense Counsel]**: He did not say anything about [Martin] punching [the victim]?
>
> **[Officer Stevens]**: No.

In response to this questioning, on redirect examination, the following exchange took place between the state's attorney and Officer Stevens:

> **[State's Attorney]**: Now, Officer Stevens, you just were asked on cross-examination that Clint Cottonwood said, I punched him, did he ever tell you what [Martin] did?
>
> **[Officer Stevens]**: Yes. He said, followed it up with—
>
> **[Defense Counsel]**: Objection, beyond the scope.
>
> . . . .
>
> **[State's Attorney]**: I guess, we're following up with the fact that he was already asked about statements that Cottonwood had made.
>
> **[The Court]**: I don't find it to be beyond the scope. I'm going to overrule the objection.
>
> **[Defense Counsel]**: Objection, hearsay.
>
> **[The Court]**: And I'm a little concerned about hearsay but we're going to allow the testimony here.
>
> . . . .
>
> **[Officer Stevens]**: He followed it up with, I hit him, and actually he made a fist and showed he swung with his right hand but then [Martin] finished [the victim] off with a shovel.

Defense counsel clearly raised the issue of what information Cottonwood relayed to Officer Stevens. Not only did Martin's defense counsel generally raise the issue of the content of Cottonwood's conversation with Officer Stevens, counsel specifically asked Officer Stevens whether Cottonwood said Martin punched the victim. The defense cannot ask whether Cottonwood said Martin struck the victim with his fists

and then object when testimony is later introduced indicating instead that Cottonwood said Martin struck the victim with a shovel. At the very least, we are unable to say that the circuit court's conclusion that defense counsel opened the door to this testimony was arbitrary or outside the bounds of reason.

[¶10.]     We are similarly unpersuaded that the circuit court abused its discretion in allowing Detective Olson's testimony. Specifically, Martin objects to the circuit court permitting Detective Olson—a detective who interviewed Cottonwood at the police station—to testify regarding Cottonwood's description of the shovels and the discussion that took place between Cottonwood and Martin regarding how to dispose of the victim's body. Again, from a review of the trial transcript, it appears that Martin's defense counsel opened the door for Detective Olson's testimony. On cross-examination, the following exchange took place between Martin's defense counsel and Detective Olson:

> **[Defense Counsel]**: [Cottonwood] told you that after they were sitting down smoking a cigarette, [Martin] then said he wanted to go kill his girlfriend?
>
> **[Detective Olson]**: Yeah.
>
> **[Defense Counsel]**: Or according to [Cottonwood], [Martin] said he also wanted to go kill his brother Nick?
>
> **[Detective Olson]**: [Martin]—yeah.

On redirect examination, the State asked Detective Olson to provide context for his answers to Martin's defense counsel's questioning. The following exchange took place between the state's attorney and Detective Olson:

> **[State's Attorney]**: The defense asked you a question about [Martin] saying he had to then go kill his girlfriend and Nick. Could you tell us the context that statement was given in?
>
> **[Detective Olson]**: They were discussing on what to do with [the victim]—

-6-

> [Defense Counsel]: Objection. That's hearsay as well, your Honor.
>
> [The Court]: You asked about it . . . . It's fair to allow a little expansion on that. Overruled.
>
> [Detective Olson]: Mr. Cottonwood said that he and Mr. Martin were discussing on what to do with the body. There was discussion about having to bury it to get rid of it. It was then brought up that they couldn't bury the body because Mr. Martin's girlfriend and his friend knew that [the victim] was down at camp with them.
>
> It was then brought up that Mr. Cottonwood said that Mr. Martin brought it up that then we need to go take care of his girlfriend and his friend if they were going to do that because he was getting that they had knowledge that he was down there.

Given defense counsel's questioning of Detective Olson regarding Cottonwood's and Martin's discussion, we are similarly unconvinced that the circuit court abused its discretion in permitting Detective Olson's testimony. The context provided by his answers to the state's attorney's redirect examination provided an explanation for why Martin would raise the possibility of killing his girlfriend or brother.

[¶11.] Finally, the circuit court did not abuse its discretion by admitting the recording of the 911 call into evidence. Martin argues that no hearsay exception applies. However, Martin ignores the antecedent requirement of excluding evidence as hearsay: the out-of-court statement must be "offered to prove the truth of the matter asserted." SDCL 19-16-1 (Rule 801(a) to (c)). Here, the State offered the recording during its direct examination of Skogstad. In responding to Martin's objection, the circuit court explicitly allowed the recording for a purpose other than to prove the facts asserted in the recording. The circuit court said:

> [The Court]: I'm going to allow the exhibit, not to prove the truth of what's contained in the exhibit, but only to show what happened and why certain things happened; including police

-7-

arriving at the scene, et cetera. So it's an explanation, but it's not offered for the truth of the matter asserted.

The circuit court gave this disclaimer in the presence of the jury. Given the deference with which we review a circuit court's evidentiary determinations, Martin has not convinced us that the circuit court's decision was arbitrary or outside the range of permissible choices. Even if we did so decide, the objected-to statements made by Skogstad in the 911 recording—regarding information communicated to him by Cottonwood—are reproduced in the testimony of Officer Stevens and Detective Olson. Considering our conclusion that the circuit court did not abuse its discretion in allowing their testimony, Martin would have to establish that admitting the 911 recording was prejudicial error independent of the testimony of Officer Stevens and Detective Olson. Martin has not done so and, consequently, has not met his burden.

[¶12.]     2.     *Whether there was sufficient evidence of premeditation to sustain the jury's guilty verdict for first-degree murder.*

[¶13.]     We review challenges to the sufficiency of evidence de novo. *State v. Brende*, 2013 S.D. 56, ¶ 21, 835 N.W.2d 131, 140. The ultimate question in such an appeal is "whether there is evidence in the record which, if believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt." *State v. Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d 329, 342 (quoting *State v. Shaw*, 2005 S.D. 105, ¶ 19, 705 N.W.2d 620, 626) (internal quotation marks omitted).

> However, an appellate court is not required to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Brende*, 2013 S.D. 56, ¶ 21, 835 N.W.2d at 140 (citations omitted) (internal quotation marks omitted).  Therefore, "we accept the evidence and the most favorable inferences that can be fairly drawn from it that support the verdict." *Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d at 342 (quoting *Shaw*, 2005 S.D. 105, ¶ 19, 705 N.W.2d at 626) (internal quotation mark omitted).  "We do not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence on appeal." *Id.*  "Consequently, the evidence is insufficient only 'when no rational trier of fact could find guilt beyond a reasonable doubt.'" *Brende,* 2013 S.D. 56, ¶ 21, 835 N.W.2d at 140 (quoting *State v. Plenty Horse,* 2007 S.D. 114, ¶ 5, 741 N.W.2d 763, 765).

[¶14.]        Martin argues that the State did not present evidence sufficient for a rational jury to find that Martin killed the victim with a premeditated design. First-degree murder occurs when one human being kills another "without authority of law and with a premeditated design to effect the death of the person killed[.]" SDCL 22-16-1, -4(1).  "Premeditation" is defined in SDCL 22-16-5.

> The term, premeditated design to effect the death, means an intention, purpose, or determination to kill or take the life of the person killed, distinctly formed and existing in the mind of the perpetrator before committing the act resulting in the death of the person killed.  A premeditated design to effect death sufficient to constitute murder may be formed instantly before committing the act.

Proof of premeditation may be inferred, *State v. Owens*, 2002 S.D. 42, ¶ 96, 643 N.W.2d 735, 757-58, from "1) the use of a lethal weapon; 2) the manner and nature of the killing; 3) the defendant's actions before and after the murder; and 4) whether there was provocation[,]" *State v. Wright*, 2009 S.D. 51, ¶ 60, 768 N.W.2d 512, 532

(quoting *State v. Owen*, 2007 S.D. 21, ¶ 36, 729 N.W.2d 356, 367) (internal quotation mark omitted).

[¶15.]　　　All four factors are present in the record.　Several pages of Cottonwood's testimony are particularly useful.　Cottonwood testified as follows:

> **[State's Attorney]**:　At some point, did you guys become upset with [the victim]?
>
> **[Cottonwood]**:　After he drank enough and he started getting a little bit mouthy and stuff, mouthy and talking out of his— talking out of his head more or less.
>
> . . . .
>
> Talking about [Martin's girlfriend] . . . .
>
> **[State's Attorney]**:　Was [Martin] upset that he was talking about this?
>
> **[Cottonwood]**:　I didn't really pay attention to it too much.　It just felt like something they normally do, I mean, the way they were talking.
>
> **[State's Attorney]**:　And so what do you remember happening?
>
> . . . .
>
> **[Cottonwood]**:　At a point after we sat there for a little while, finally [Martin] got mad enough where he got up and started smacking [the victim].
>
> **[State's Attorney]**:　When you say he was smacking him, how—what do you mean?
>
> **[Cottonwood]**:　I could hear [Martin] hitting [the victim], but I didn't look over there, I guess.
>
> . . . .
>
> . . . So I keep messing with the radio and I didn't even pay attention to what they were doing.
>
> . . . .
>
> At one point it stopped, so I looked over real quick and [Martin is] helping him up and it started again.　I could hear [Martin] smacking him.　And I was—it was, like, smack, smack.　Then all of a sudden you heard dink, dink, dink.
>
> **[State's Attorney]**:　And what did [Martin] have in his hands?
>
> **[Cottonwood]**:　I looked over and he had a shovel, a little broken handle shovel in his hand.

. . . .

[Martin] was standing there over [the victim].

**[State's Attorney]**: Was there anything unusual about [Martin] at that point?

**[Cottonwood]**: Yeah. He was naked.

. . . .

I continued just to try not to look over there and try to figure out what the heck is going to happen next. So I just sat there and heard dink, dink again and then several more times. And then [Martin] comes back and stands in front of me with a shovel in his hand still naked, so I'm not looking at him.

**[State's Attorney]**: What shovel—does he still have that same broken handled shovel?

**[Cottonwood]**: No, he has the longer shovel then.

**[State's Attorney]**: Okay. Now, between the time that you see him with the shorter handled shovel and the upper handled shovel, what was [the victim] doing?

**[Cottonwood]**: He was laying on the ground over there.

. . . .

Making a gurgling sound.

. . . .

Like an animal that's been shot in the lungs and it's gurgling on his blood.

. . . .

**[State's Attorney]**: And then you heard—then is when [Martin] got the bigger handled shovel?

**[Cottonwood]**: Somewhere in that timeframe, yeah.

**[State's Attorney]**: After he had the bigger handled shovel, did you hear anything else from [the victim]?

**[Cottonwood]**: No.

**[State's Attorney]**: What happened at that point?

**[Cottonwood]**: [Martin] came and sat down and got his clothes back on and sat down and sat quietly after that.

[¶16.]     First, a rational jury could infer premeditation because Martin used a

lethal weapon to kill the victim. A deadly—or lethal—weapon is statutorily defined

as "any firearm, stun gun, knife, or device, instrument, material, or substance, whether animate or inanimate, which is calculated or designed to inflict death or serious bodily harm, or by the manner in which it is used is likely to inflict death or serious bodily harm[.]" SDCL 22-1-2(10). Cottonwood testified that he saw Martin standing over the victim with a shovel and that he heard a "dink, dink, dink." Given the standard of review in this case, a rational jury could easily infer that Martin used the shovels to beat the victim. Such an inference is strongly supported by the medical examiner's testimony that the victim suffered extensive injuries, including multiple skull fractures consistent with the type of injury that would be caused by a shovel. Using a shovel as a bludgeon to repeatedly strike another person in the head is using it in a manner likely to inflict death or serious bodily harm; therefore, the first factor weighs in favor of a finding of premeditation.

[¶17.]    Second, a rational jury could infer premeditation from the nature of the killing. According to Cottonwood's testimony, the killing took place in multiple phases. Martin first struck the victim with his fists. He then stopped and helped the victim get up before striking him again. Martin stopped striking the victim with his fists, got undressed, and then started striking the victim with a shovel. At some point, Martin again temporarily ceased the attack in order to retrieve a longer-handled shovel with which to continue beating the victim. Therefore the second factor weighs in favor of a finding of premeditation.

[¶18.]    Third, a rational jury could infer premeditation from Martin's actions before and after the murder. A rational jury could view Martin's removal of his clothing before beating the victim with a shovel as a conscious attempt to avoid the

transfer of physical evidence to his clothing. Detective Olson also testified that he observed Martin "sucking" his fingernails in an attempt—in Detective Olson's view—to clean underneath his fingernails. The State presented, and the jury viewed, a recording of this conduct. Detective Olson also testified that he witnessed Martin rubbing and scratching his legs in a manner that led Detective Olson to believe Martin "was trying to remove something or get something off his leg or clean his legs[.]" Finally, the jury also heard testimony that the victim's body was covered with a tarp, and that one of the shovels used to beat the victim was found next to a freshly dug trench near the camp. Because "[a]ttempts to conceal or dispose of evidence may also support an implicit finding of premeditation[,]" *Owens*, 2002 S.D. 42, ¶ 97, 643 N.W.2d at 758, this third factor also weighs in favor of a finding of premeditation.

[¶19.]     Finally, a rational jury could infer premeditation from evidence that the victim provoked Martin. Cottonwood described the victim as "mouthy" and said the victim repeatedly commented on Martin's girlfriend's breasts. According to Cottonwood, Martin finally "got mad enough" to physically attack the victim. Considering this provocation, the use of a deadly weapon, the prolonged and intermittent nature of the attack, and Martin's apparent efforts to conceal or dispose of evidence, this evidence, if believed by the jury, was sufficient to establish Martin's guilt of premeditation beyond a reasonable doubt.

### Conclusion

[¶20.]     The circuit court's decision to allow the objected-to testimony of Officer Stevens and Detective Olson, as well as the 911 recording, was not arbitrary or

unreasonable; consequently, it was not an abuse of discretion. Similarly, the record reflects ample evidence that, if believed, would be sufficient for a rational trier of fact to convict Martin. Therefore, we affirm.

[¶21.] ZINTER, SEVERSON, WILBUR, Justices and KONENKAMP, Retired Justice, concur.

[¶22.] KERN, Justice, not having been a member of the Court at the time this action was assigned to the Court, did not participate.