#28063-a-DG
**2018 S.D. 4**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

RUSSELL RAY BERTRAM,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
GREGORY COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE KATHLEEN F. TRANDAHL
Retired Judge
\* \* \* \*

MARTY J. JACKLEY
Attorney General

PAUL S. SWEDLUND
MIKAL G. HANSON
Assistant Attorneys General
Pierre, South Dakota

    Attorneys for plaintiff

    and appellee.

MICHAEL J. BUTLER
Sioux Falls, South Dakota

and

CLINT L. SARGENT
RALEIGH E. HANSMAN of
Meierhenry Sargent, LLP
Sioux Falls, South Dakota

    Attorneys for defendant
    and appellant.

\* \* \* \*

ARGUED OCTOBER 4, 2017
OPINION FILED **01/10/18**

GILBERTSON, Chief Justice

[¶1.]     Russell Ray Bertram was convicted of first-degree murder and sentenced to imprisonment for life in connection with the shooting death of his fiancée, Leonila Stickney.  Bertram appeals, arguing the circuit court violated his Sixth Amendment right of cross-examination by refusing to admit evidence that Bertram passed a polygraph examination for the purpose of impeaching another witness's testimony.  Bertram also argues the circuit court improperly admitted character evidence used against him.  We affirm.

### Facts and Procedural History

[¶2.]     To escape abject poverty, Leonila Stickney came to the United States from the Philippines in 2004 as the 22-year-old, mail-order bride of 73-year-old David Stickney ("Stickney").  In October of the same year, Stickney and Leonila had a son.  The three lived together in Bridgewater, where Leonila worked at a nursing home.  Every month, Leonila sent $300 of her earnings to help support her family still residing in the Philippines.[1]  In late 2008, Leonila left Stickney.

[¶3.]     After leaving Stickney, Leonila became involved with Russell Bertram, a 56-year-old, former law-enforcement officer.  At the time, Bertram was in bankruptcy and had debt exceeding $100,000.  In early 2009, several months after the relationship began, Bertram and Leonila visited an insurance agent and purchased a $750,000 life-insurance policy on Leonila for a term of five years.

---

1.     In addition to her mother and father, Leonila had three brothers and four sisters.

Bertram also purchased another $170,000 in life-insurance coverage on Leonila by mail. Both policies listed Bertram as the sole beneficiary.

[¶4.] Bertram and Leonila's relationship continued throughout 2009. However, Bertram came to suspect that Leonila—who was still married to Stickney—was involved with another man. In August and September 2009, Bertram discovered several late-night calls made from Leonila's mobile phone. On October 24, 2009, while accompanying Bertram on a roadside hunting trip in Gregory County, Leonila told Bertram that she was late menstruating that month. Bertram, who underwent a vasectomy in the late 1970s, responded by asking Leonila who she had been "messing around with." Unaware that Bertram was not able to father children, Leonila denied being unfaithful.

[¶5.] During the hunting trip, Bertram and Leonila drove to a section-line road about seven miles north of Gregory. After shooting his legal limit, Bertram placed his loaded shotgun into the cab of his truck without engaging the weapon's safety. Bertram swept the weapon across Leonila, and it discharged, striking Leonila in her torso. The blast severed Leonila's aorta from her heart. Bertram called 911 and drove Leonila to the Gregory County Hospital. At the hospital, Bertram spoke with Gregory County Sheriff Charlie Wolf and then left to show Deputy Sheriff Tim Drey the site of the shooting. After returning, Bertram was informed that Leonila had died on the operating table. Sheriff Wolf photographed Bertram's vehicle, confiscated the shotgun, and released Bertram.

[¶6.] Shortly after Leonila's death, in June and July 2010, her estate learned of the life-insurance policies. Stickney retained attorney Doug Dailey to

represent Leonila's estate. The estate challenged Bertram's right to the insurance proceeds, arguing Leonila's death was intentional. Bertram's attorney, Clint Sargent, sent a letter to the estate claiming that Bertram had passed a unilateral polygraph test administered by a former DCI agent.[2] The estate decided to settle, citing a desire to avoid protracted litigation. Bertram and the estate agreed that Bertram would retain $320,000 of the insurance proceeds plus $82,000 in interest and that the estate would receive the remaining $600,000. The settlement agreement explicitly provided that the money Bertram was to receive from the larger policy (proceeds plus interest) was "for the benefit of Leonila D. Stickney's family in the Philippines."

[¶7.] Initially, Leonila's death was investigated as an accidental shooting. However, Sheriff Wolf soon began to suspect foul play. Sheriff Wolf learned of several possible motives Bertram could have had for killing Leonila. A series of text messages on Leonila's phone, beginning several days before and ending the day of the shooting, indicated she was involved with another man, Nathan Meeter. The messages also indicated that Leonila was pregnant with Meeter's child and that she was considering leaving Bertram for Meeter. Leonila's autopsy confirmed that she was pregnant at the time of her death. And in December 2009, Sheriff Wolf also learned that Bertram was the sole beneficiary of $920,000 in life-insurance policies on Leonila. Sheriff Wolf enlisted the assistance of DCI agent Guy DiBenedetto.

---

2. In the criminal investigation, DCI rejected the result of this polygraph test and asked Bertram to submit to another. Bertram declined. He eventually took another polygraph test after being imprisoned. The result of that test was not disclosed.

Sheriff Wolf and Agent DiBenedetto interviewed Bertram on January 21, 2011. Adding to Sheriff Wolf's suspicions, Bertram gave several varying accounts of the shooting. And on January 14, 2014, Agent DiBenedetto visited Bertram's residence for an additional interview.

[¶8.]    Bertram was not arrested until 2015. On September 8, 2015, Bertram was indicted for first-degree murder for killing Leonila. Prior to trial, the circuit court ruled on a number of preliminary motions. Particularly relevant to this appeal, the court ruled the State would be permitted to introduce evidence that Bertram had multiple sexual encounters with an exotic dancer in September and October 2009 as well as with two other women on October 19 and 20, 2009. The court also ruled Bertram would not be permitted to discuss his polygraph test. But at trial, the State called Dailey as a witness to discuss the estate and Bertram's settlement. Dailey testified that in a phone conversation, he informed Sargent that the estate believed the entirety of the insurance proceeds should be paid into the estate. According to Dailey, Sargent replied, "No way." Dailey also testified that Leonila's estate decided to settle in order to avoid protracted litigation. After the State's examination of Dailey concluded, Bertram asked the court to reconsider its preliminary ruling and admit the letter sent from Sargent to Dailey that included the result of Bertram's polygraph test. The court declined.

[¶9.]    A jury convicted Bertram of first-degree murder, and the circuit court sentenced him to imprisonment for life. Bertram appeals, raising the following issues:

> 1.    Whether the circuit court erred by refusing to admit Bertram's polygraph evidence.

-4-

2.      Whether the circuit court erred by admitting evidence of Bertram's sexual liaisons with other women during his engagement to Leonila.

## Standard of Review

[¶10.]      "Our review of a circuit court's evidentiary ruling follows a two-step analysis: 'first, to determine whether the trial court abused its discretion in making an evidentiary ruling; and second, whether this error was a prejudicial error that "in all probability" affected the jury's conclusion.'" *State v. Martin*, 2015 S.D. 2, ¶ 7, 859 N.W.2d 600, 603 (emphasis omitted) (quoting *Supreme Pork, Inc. v. Master Blaster, Inc.*, 2009 S.D. 20, ¶ 59, 764 N.W.2d 474, 491).

## Analysis and Decision

[¶11.]      ***1.     Whether the circuit court erred by refusing to admit Bertram's polygraph evidence.***

[¶12.]      Bertram first argues the circuit court erred by excluding his polygraph evidence. He contends that under the Sixth Amendment's Confrontation Clause, he was entitled to present the result of his polygraph test as part of an effective cross-examination. The testimony that gave rise to this claim is as follows:

> **[Dailey]**: I had a telephone call with attorney Clint Sargent on November 4th of 2010. I know that we had some back and forth going on with regard to leaving messages and trying to get hold of each other.
>
> At that time, I advised Mr. Sargent that we believed that Mr. Bertram had intentionally killed Leonila and that he should not be entitled to any of the life insurance proceeds and asked for them to pay those over to the estate.
>
> **[State]**: Did you ask—so, you asked Mr. Sargent to pay the Globe policy over to the estate or the New York Life?
>
> **[Dailey]**: Just the life insurance policies in general. I don't think it was differentiated between the two or which one we wanted paid over at that time. We were simply asking for all of the proceeds to be paid to the estate.

> **[State]**: Okay. And, what was Mr. Sargent's response to that?
>
> **[Dailey]**: My notes have the quote of, "no way."
>
> **[State]**: So, that's a direct quote from Mr. Sargent.
>
> **[Dailey]**: According to my notes.
>
> **[State]**: What did Mr. Sargent tell you about his reason for saying, "no way"?
>
> **[Dailey]**: Just that they disputed that it was an intentional act.
>
> **[State]**: And, did he say that the proceeds had another—.
>
> **[Sargent]**: Your Honor, I'm just going to object. If [the State] is going to ask about things we talked about, I have no objection to that. But, I hope that then opens the door to everything that we talked about in that conversation.
>
> **[Court]**: It does. You may continue.

After the State concluded its examination of Dailey, Bertram's attorney asked the court to reconsider its preliminary ruling on the admissibility of his polygraph-test result:

> **[Sargent]**: Your Honor, I request relief from the court's order on motion in limine precluding evidence that Mr. Bertram passed a polygraph examination. I think the State has opened the door by representing to this jury that the reasons that Mr. Stickney decided to settle this case were in large part just because he wanted to get out of the country and he wanted this over with fast.
>
> The last letter that I sent to Mr. Dailey that has been referenced here in the settlement negotiations included an explanation of the polygraph, what my intentions were if this went to civil litigation, and I believe that's a fair area of cross-examination after the State has presented it to this jury that, "oh, they just wanted it over with to get out of the country."
>
> I should be allowed to cross-examine that I had presented the strength of my case in defending these matters; that that was a critical part of what they considered in deciding whether to settle this case.
>
> I believe the State's opened the door, and I ask permission to go into that; for that limited purpose. And, the court can give a limiting instruction, telling the jury that they're not to consider whether or not he actually passed the polygraph, but to consider

-6-

it as to the issue as to why the estate settled the claims against Mr. Bertram.

Bertram's attorney then made an offer of proof, asking the court to admit the letter sent from Sargent to Dailey that indicated Bertram had passed a polygraph test. During the offer of proof, Bertram's attorney and the State both examined Dailey about the letter.

[¶13.]     Contrary to Bertram's characterization of this issue, this is not a constitutional question—it is an evidentiary one. The Sixth Amendment does not require a court to admit polygraph-test results into evidence. *See United States v. Scheffer*, 523 U.S. 303, 312, 118 S. Ct. 1261, 1266, 140 L. Ed. 2d 413 (1998) (holding Sixth Amendment not violated by per se rules prohibiting the admission of polygraph-test results).[3] Thus, this issue simply involves an evidentiary ruling. As

---

3.     In *Scheffer*, the United States Supreme Court considered "whether Military Rule of Evidence 707, which makes polygraph evidence inadmissible in court-martial proceedings," violates the Sixth Amendment. 523 U.S. at 305, 118 S. Ct. at 1263. The Supreme Court said: "A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *Id.* at 308, 118 S. Ct. at 1264. Thus, a per se rule that excludes polygraph evidence does not violate the Sixth Amendment so long as it is not "arbitrary" or "disproportionate to the purposes [it is] designed to serve." *Id.* (quoting *Rock v. Arkansas*, 483 U.S. 44, 56, 107 S. Ct. 2704, 2711, 97 L. Ed. 2d 37 (1987)). The Supreme Court further held that "State and Federal Governments unquestionably have a legitimate interest in ensuring that reliable evidence is presented to the trier of fact in a criminal trial[,]" *id.* at 309, 118 S. Ct. at 1265, and that a per se rule excluding all polygraph evidence "is a rational and proportional means of advancing the legitimate interest in barring unreliable evidence[,]" *id.* at 312, 118 S. Ct. at 1266. As the Supreme Court explained:

> Although the degree of reliability of polygraph evidence may depend upon a variety of identifiable factors, there is simply no way to know in a particular case whether a polygraph examiner's conclusion is accurate, because certain doubts and uncertainties plague even the best polygraph exams. Individual

(continued . . . )

noted above, this Court reviews evidentiary rulings under the abuse-of-discretion standard. *Martin*, 2015 S.D. 2, ¶ 7, 859 N.W.2d at 603.

[¶14.] The question, then, is whether the letter including Bertram's polygraph-test result was admissible under South Dakota's rules of evidence. As the State points out, this Court has consistently held that polygraph-test results are not admissible. *E.g., In re Fuller*, 2011 S.D. 22, ¶ 25 n.4, 798 N.W.2d 408, 414 n.4; *Sabag v. Cont'l S.D.*, 374 N.W.2d 349, 352 (S.D. 1985) ("In South Dakota criminal cases, polygraph results are not admissible evidence.").[4] This per se rule is based on evidentiary Rules 402 (relevancy), 403 (probative value), and 702 (expert-witness testimony)[5]:

> The rationale advanced for not admitting evidence of polygraph results, in civil or criminal cases, is that such evidence is irrelevant because of dubious scientific value [(Rule 402)], it has no "general scientific acceptance as a reliable and accurate means of ascertaining truth or deception," it is not reliable [(Rule 702)], it has no probative value, and it is likely to be given significant, if not conclusive weight by the jury, so that "the jurors' traditional responsibility to collectively ascertain the facts and adjudge guilt or innocence is thereby preempted" [(Rule 403)].

_____

(. . . continued)

> jurisdictions therefore may reasonably reach differing conclusions as to whether polygraph evidence should be admitted.

*Id.* Thus, not even per se rules against admitting polygraph evidence violate the Sixth Amendment. *Id.*

4. South Dakota is not alone—"[m]ost States maintain *per se* rules excluding polygraph evidence." *Scheffer*, 523 U.S. at 311, 118 S. Ct. at 1266.

5. These rules of evidence are codified at SDCL 19-19-402, -403, and -702, respectively.

*Sabag*, 374 N.W.2d at 353 (citations omitted) (first quoting *State v. Green*, 531 P.2d 245, 251 (Or. 1975); and then quoting *United States v. Alexander*, 526 F.2d 161, 168 (8th Cir. 1975)). This Court has strictly adhered to this rule. *See State v. Muetze*, 368 N.W.2d 575, 587-88 (S.D. 1985) (rejecting admission of polygraph-test results offered to impeach a witness's testimony).

[¶15.] Although Bertram acknowledges this Court's per se rule against admitting polygraph-test results, he claims that "[u]ntil now, South Dakota has not had occasion to rule on polygraph admissibility when such evidence is offered to challenge witness credibility." But contrary to Bertram's claim, this is not a case of first impression. In *Muetze*, this Court considered the same question presented in this case: "whether [the result of] a polygraph examination . . . should have been admitted when offered by the defense as impeachment evidence." 368 N.W.2d at 587. The Court acknowledged "that polygraph results are admissible for some purposes" in other jurisdictions but held that those cases are "inapposite" because "[p]olygraph results are not admissible as evidence in South Dakota [c]ourts." *Id.* at 588. Thus, when previously presented with the same argument that Bertram makes in this case, this Court held: "The trial court was correct in not allowing the rule against introduction of polygraph results to be circumvented in this way." *Id.* We reaffirmed this strict prohibition on admitting polygraph-test results in *State v. Waff*, 373 N.W.2d 18, 24-25 (S.D. 1985). So under controlling precedent, the result of Bertram's polygraph test was per se inadmissible.[6]

---

6. We do not foreclose the possibility of reconsidering this per se rule in the future if presented with an appropriate case. However, abandoning the

(continued . . . )

[¶16.] Even so, Bertram argues his polygraph evidence was admissible under *United States v. Tenorio*, 809 F.3d 1126 (10th Cir. 2015). In that case, Tenorio consented to undergo a polygraph test after being accused of sexually abusing his 16-year-old niece. *Id.* at 1128. In the course of the test, Tenorio confessed and wrote a letter of apology to the victim. *Id.* At trial, the prosecutor asked Tenorio about the letter, and Tenorio claimed that he was distraught during the test, that the polygrapher yelled at him, and that he only wrote what the polygrapher told him to write. *Id.* at 1129. Because Tenorio alleged he was coerced by the polygrapher, the trial court permitted the prosecutor to question Tenorio about the circumstances of the polygraph test, but the court gave a limiting instruction to the jury. *Id.* at 1129-30. On appeal, the United States Court of Appeals for the Tenth Circuit affirmed. The court held "that when the defendant opens the door to polygraph evidence, such as attacking the nature of a criminal investigation or asserting that testimony was coerced, polygraph evidence is admissible rebuttal evidence[.]" *Id.* at 1130-31.

[¶17.] Bertram's reliance on *Tenorio* is misplaced. The rule articulated in *Tenorio* applies "where polygraph evidence is not offered as scientific evidence," *id.* at 1130; i.e., "where it is not offered to prove the truth of the polygraph result," *id.* at 1131 (quoting *United States v. Blake*, 571 F.3d 331, 346 (4th Cir. 2009)). Thus, in *Tenorio*, the relevant evidence was not the polygraph-test result itself but rather

_____

(. . . continued)

> per se rule against admitting polygraph-test results would require, at a minimum, strong evidence that the technology of polygraphs has advanced to such a degree that they are generally accepted as reliable in the scientific community.

the circumstances under which the test was administered. The jury was not informed of the test result, and the trial court specifically instructed the jury not to speculate as to the result of the test. *Id.* at 1130. In contrast, Bertram seeks to introduce the *result* of his polygraph test instead of incidental information; he offered his polygraph-test result in order to prove that Leonila's estate's decision to settle was motivated by that result.

[¶18.] Even if Bertram's polygraph evidence did not implicate Rule 702's reliability concerns, that evidence was still subject to "the general test of admissibility applicable to all proffered evidence." *Waff*, 373 N.W.2d at 24; *see also Tenorio*, 809 F.3d at 1131 (holding polygraph evidence not offered for its scientific value is still "subject to Rule 403's probative value and prejudicial effect considerations"). A "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." SDCL 19-19-403. The circuit court excluded Bertram's polygraph evidence after conducting a Rule 403 balancing. In the court's view, the probative value of the polygraph evidence was substantially outweighed by the "tremendous risk that the jury will speculate and only consider the evidence for the truth of the matter asserted, even if the court gives a limiting instruction." The court also correctly acknowledged that admitting the evidence "would allow [Bertram] to introduce evidence which is not admissible in South Dakota as direct evidence in [his] case in chief." *See Muetze*, 368 N.W.2d at 588. The court's determination is further supported by the fact that Bertram's polygraph test was

unilateral—a "privately commissioned polygraph test, which [is] unknown to the government until after its completion, is of *extremely* dubious probative value[.]" *United States v. Montgomery*, 635 F.3d 1074, 1094 (8th Cir. 2011) (emphasis added) (quoting *United States v. Sherlin*, 67 F.3d 1208, 1217 (6th Cir. 1995)). So even under *Tenorio*, Bertram's evidence is inadmissible.

[¶19.] Finally, even if the court did err by excluding Bertram's polygraph-test result, Bertram must also establish that such error was prejudicial. *Martin*, 2015 S.D. 2, ¶ 7, 859 N.W.2d at 603. According to Bertram, the polygraph evidence was meant to rebut Dailey's assertion that Leonila's estate's motivation for settling the civil action was to avoid protracted litigation. But the estate's motivation for settling the civil action is a collateral matter. Bertram does not explain how the estate's motivation for settling the civil action is relevant to the jury's determination that he murdered Leonila. Thus, the court's exclusion of Bertram's polygraph-test result did not "'in all probability' affect[] the jury's conclusion." *Id.* (quoting *Supreme Pork*, 2009 S.D. 20, ¶ 59, 764 N.W.2d at 491).

[¶20.] In light of the foregoing, the circuit court did not err in excluding Bertram's polygraph evidence. Even if this Court were to carve out an exception to the per se rule against admitting polygraph-test results, the court determined Bertram's polygraph evidence was inadmissible under Rule 403. And even if the court erred in its Rule 403 analysis, Bertram has not established prejudice.

[¶21.] ***2.   Whether the circuit court erred by admitting evidence of Bertram's sexual liaisons with other women during his engagement to Leonila.***

[¶22.] Next, Bertram argues evidence of his sexual contact with other women immediately prior to Leonila's death was irrelevant and improperly admitted under

SDCL 19-19-404(b). The State responds that this evidence is relevant to establishing motive. Under Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." SDCL 19-19-404(b)(1). However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." SDCL 19-19-404(b)(2). Thus, "[r]elevant other acts evidence is admissible for any purpose other than proving the character of the defendant or his propensity to act in conformity therewith." *State v. Huber*, 2010 S.D. 63, ¶ 56, 789 N.W.2d 283, 301 (quoting *State v. Janklow*, 2005 S.D. 25, ¶ 33, 693 N.W.2d 685, 697).

[¶23.] The evidence at issue was relevant. This Court has previously held that "a defendant is . . . not entitled to have the jury decide his case on a pretense that his behavior and feelings toward the victim are nothing but routinely warm and affectionate." *Id.* ¶ 57, 789 N.W.2d at 301-02 (quoting *State v. Laible*, 1999 S.D. 58, ¶ 23, 594 N.W.2d 328, 335). Evidence of infidelity is relevant "to explain . . . state of mind[] and to prove . . . motive, intent, and absence of accident." *Id.* ¶ 57, 789 N.W.2d at 302. At the January 28, 2016 motion hearing, the State explained the purpose for which it offered the evidence:

> [T]he purpose of this evidence is to show that Mr. Bertram had no attachment to Leonila, that his claim that he was in love with her, that he misses her to this day, that it was the best relationship he ever had, all those things that he would introduce into this record to show that this was an accident are contradicted by the way that he was living his life immediately prior to the murder.

The circuit court agreed that the evidence was relevant, noting: "Mr. Bertram has made statements that he was in the best relationship he had ever had so the sexual encounters with other women go to rebut that claim." This conclusion was not "outside the range of permissible choices[.]" *Martin*, 2015 S.D. 2, ¶ 7, 859 N.W.2d at 603 (quoting *Gartner v. Temple*, 2014 S.D. 74, ¶ 7, 855 N.W.2d 846, 850).

[¶24.] Even if the circuit court's relevancy determination was an abuse of discretion, such error would be reversible only if it "'in all probability' affected the jury's conclusion." *Id.* (quoting *Supreme Pork*, 2009 S.D. 20, ¶ 59, 764 N.W.2d at 491). Bertram does not argue—nor does the record suggest—that the jury was so influenced. Thus, even if the court erred, Bertram is not entitled to relief.

## Conclusion

[¶25.] South Dakota's per se rule against admitting polygraph-test results does not violate the Sixth Amendment. The circuit court did not abuse its discretion either by excluding Bertram's polygraph evidence or by admitting the State's evidence of Bertram's sexual liaisons with three other women in the days leading up to Leonila's death. Even if the court erred, Bertram has not established prejudice on either issue. Therefore, reversal is not warranted.

[¶26.] We affirm.

[¶27.] ZINTER, SEVERSON, and KERN, Justices, and WILBUR, Retired Justice, concur.

[¶28.] JENSEN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.