#28993-r-PJD
**2021 S.D. 2**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

v.

ROBERT SUCHOR,                          Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MICHELLE K. COMER
Judge

* * * *

JASON R. RAVNSBORG
Attorney General

MATTHEW W. TEMPLAR
Assistant Attorney General
Pierre, South Dakota                          Attorneys for plaintiff
                                              and appellee.


PAUL J. ANDREWS
Rapid City, South Dakota                          Attorney for defendant
                                              and appellant.

* * * *

CONSIDERED ON BRIEFS
MAY 26, 2020
OPINION FILED **01/06/21**

DEVANEY, Justice

[¶1.]     Robert Suchor appeals the jury's verdict finding him guilty of three counts of grand theft by misappropriation of funds by a contractor. He asserts that the State failed to present sufficient evidence on one or more essential elements, and therefore, the circuit court erred in denying his motion for judgment of acquittal on each conviction. We reverse all three convictions.

## Factual and Procedural Background

[¶2.]     Robert Suchor is a contractor from Pine Haven, Wyoming. He owned and operated New Wave Builders, and as discussed below, in 2016, he entered into three separate contracts to construct homes for three families in Spearfish, South Dakota.

*The Dahl Project*

[¶3.]     In April 2016, Carole and Dennis Dahl met Suchor through their realtor, Sandy Donahue. After multiple meetings, the Dahls and Suchor executed a contract on November 30, 2016, for Suchor to build the Dahls' home for $250,000. The contract provided that the Dahls were to pay Suchor $25,000 upon signing the contract. The contract further provided that Suchor would finish the concrete foundation and interior flatwork within 30 days after receiving the first contract payment.

[¶4.]     The Dahls paid Suchor $25,000 on December 1, 2016. However, construction on the home did not begin as planned,[1] and after the Dahls learned

---

1.     According to Suchor, he could not begin digging for the foundation because the ground was frozen. The contract provided for delays due to extreme

(continued . . .)

that Suchor had yet to obtain a building permit, the Dahls terminated their contract with Suchor on December 16. They requested he return the $25,000, but Suchor refused, indicating he had spent approximately 104 hours on the project (arguably worth $10,400) and had purchased Styrofoam foundation forms. Ultimately, the Dahls filed a civil suit against Suchor, which was stayed pending the resolution of this criminal proceeding.

*The Pavich Project*

[¶5.] Frank and Kit Pavich wanted to build and thereafter sell for profit what they called a "spec-house." Sandy Donahue also introduced the Paviches to Suchor, and on July 13, 2016, the parties executed a contract whereby Suchor would build the spec-house for $332,000. Under the contract, Suchor was to be issued progress payments, and the disbursements to Suchor were to be processed through Black Hills Land and Title. Shortly after Suchor began work on the project, the Paviches decided to make the spec-house their personal residence. As a result, multiple changes were made to the construction plans. Rather than execute a new contract, the parties agreed that the Paviches would pay for any upgrades or extras.

[¶6.] It is undisputed that over the course of the project, Suchor and Frank Pavich's relationship deteriorated. Eventually the parties could no longer work together, and on May 27, 2017, before the project was finished, Suchor stopped

---

(. . . continued)

weather and required the contractor to notify the owner of such. Suchor sent Carole Dahl a text message on December 12, 2016, explaining he could not "open a hole" until the weather breaks, and indicating that he "hoped" he would be able to do so "around the holidays." Carole responded, "We understand" and "thanks for checking in."

working on it.  By that time, according to Pavich, he had paid Suchor $329,000 of the $332,000 contract price and had also spent $99,000 on the change orders and upgrades.  The record is not clear as to how much of this $99,000 was initially expended by Suchor and then reimbursed by Pavich, or whether some of these expenses were paid directly by Pavich after Suchor stopped working on the project.

[¶7.] Pavich testified that after Suchor left the job, he learned that Suchor had not paid an invoice from Wires R Us for $16,681.66 for electrical work done on the project.  Suchor maintained that he did not pay this bill because Pavich still owed him money on the project, and also because he had reached an agreement with Pavich when they parted ways as to how the remaining bills would be handled.  Ultimately, Pavich paid Wires R Us $20,852.07 in December 2017, which, according to Pavich, was the total amount due after all the electrical work on the contract had been finished.

*The Feeser Project*

[¶8.] On July 29, 2016, Justin and Kristen Feeser entered into a contract with Suchor for the construction of a home for $385,000.  The contract required that the home be constructed by the end of November 2016.  The evidence presented at trial revealed that Suchor's work on this project was fraught with issues.[2]  Feeser

---

2. For example, Suchor did not start construction on the Feeser project until September 2016 because he was busy with other jobs.  When he did start and poured the concrete footings, his work did not pass City inspection due to the discovery of excess backfill on the lot that was not suitable for a foundation.  In order to remedy the problem, Suchor had to remove the footings, excavate down to the native soil, and repour the concrete.  This set the project timeframe back three months, and according to Suchor, he personally spent

(continued . . .)

eventually became so frustrated with Suchor's work that in July 2017, Feeser offered to sell Suchor the unfinished house. Suchor agreed; however, he could not obtain financing. The Feesers then agreed, at Suchor's suggestion, to sell the house to Suchor's brother. Before the scheduled closing, Feeser learned that an outstanding balance was owed to J&M Drywall for $13,184. Feeser asked Suchor about this bill on August 9, 2017, the day before the scheduled closing, and according to Feeser, Suchor confirmed that J&M Drywall had been paid in full.

[¶9.] Suchor later explained that he had planned to pay J&M Drywall the amount due with funds Feeser had agreed to pay him at closing. Based on this understanding, Suchor had given J&M Drywall a check that same day (August 9) for the balance due, but after the closing did not occur as planned, Suchor's check bounced. Ultimately, the sale fell through, and Feeser fired Suchor on August 19, 2017. According to Feeser, he had paid Suchor $330,000 of the $385,000 due under the contract. Feeser later learned that the check Suchor issued to J&M Drywall had bounced, and on September 29, 2017, Feeser paid J&M Drywall the outstanding invoice balance. Feeser then brought a civil suit against Suchor, which at the time of the criminal trial, was in arbitration.

*The Criminal Case*

[¶10.] Meanwhile, on July 11, 2017, Frank Pavich filed a complaint with the Spearfish Police Department, claiming that he gave Suchor money to pay Wires R Us but Suchor did not remit payment. During the investigation, Detective Jason De

---

(. . . continued)
an additional $40,000 to remedy the problem. The concrete work was not finished until January 2017.

Neui received additional complaints about Suchor from the Dahls and the Feesers. On September 12, 2017, Detective De Neui discussed the homeowners' concerns with Suchor in a recorded telephone call. Suchor denied any wrongdoing, and later provided the detective a detailed memo responding to the various complaints by the homeowners.

[¶11.] On September 20, 2017, a grand jury indicted Suchor on three counts of grand theft by misappropriation of funds by a contractor. On October 17, 2018, the grand jury issued a superseding indictment alleging, in addition to the same three counts of misappropriation of funds by a contractor as to each project, three alternative counts of grand theft by deception and two alternative counts of grand theft by embezzlement as to the Dahl and Pavich projects. Suchor pled not guilty, and the case proceeded to a jury trial on February 19 through February 22, 2019.

[¶12.] At trial, the State presented testimony from Carole Dahl, Frank Pavich, and Justin Feeser. The State also presented testimony from Spearfish building official Tom Paisley, real estate agent Donahue, a representative from Wires R Us, and a past employee of Suchor's. After the State rested, Suchor moved for judgment of acquittal on all charges. The circuit court granted the motion on the alternative count of grand theft by deception related to the Dahl project and denied the motion as to all remaining charges.[3] However, the court expressed "reservations" about the remaining grand theft by deception and embezzlement

---

3. The court's dismissal of the theft by deception count was based on our ruling in *State v. Morse*, 2008 S.D. 66, 753 N.W.2d 915 and the court's finding that the State had not presented any evidence showing Suchor had an intent to defraud the Dahls at the time he received their payment.

counts, noting "there's very little evidence that there was a specific intent to defraud . . . ."

[¶13.] Thereafter, Suchor testified in his defense. He acknowledged that he received $25,000 from the Dahls and did not pour their concrete foundation, but he noted that the 30-day timeframe for completing this phase had not yet expired when he was fired and pointed to provisions in the contract allowing for delays due to weather conditions. He testified that he did not return the money because he had incurred expenses in preparing to begin construction on the Dahl project. As to the Pavich project, Suchor testified that he did not pay the outstanding balance on the Wires R Us invoice because Pavich owed him money on the contract for services performed. In regard to the Feeser project, Suchor testified that he had intended on paying the drywall bill from the proceeds of the closing on the sale of the Feeser house to his brother, but when that sale did not occur, he did not have the funds to pay the bill. Suchor testified that he did not thereafter pay the remaining drywall balance because the Feesers owed him over $13,000 for other services performed.

[¶14.] After Suchor testified, the circuit court reconsidered Suchor's motion for judgment of acquittal on the remaining counts and granted the motion as to all the alternative theft counts related to each of the three projects.[4] Only the three

---

4. The circuit court dismissed the theft by deception counts relying on our decisions in *Morse*, 2008 S.D. 66, 753 N.W.2d 915, and *State v. Jackson*, 2009 S.D. 29, 765 N.W.2d 541, and finding the State had offered no evidence that Suchor had an "intent to defraud at the inception" of these other contracts.

In dismissing the embezzlement counts, the court relied on *Commercial National Bank of Sturgis v. Smith*, 60 S.D. 376, 244 N.W. 521 (1932) (addressing a former version of the contractor theft statute), for the

(continued . . .)

counts alleging grand theft by misappropriation of funds by a contractor were submitted to the jury, and the jury found Suchor guilty on all three counts. In a post-trial brief, Suchor renewed his motion for judgment of acquittal, which the circuit court denied. The court sentenced Suchor to ten years in the penitentiary on each count to run concurrently, all suspended on conditions including that Suchor pay restitution to all the homeowners. Suchor appeals, asserting that the circuit court erred in denying his motion for judgment of acquittal.

## Standard of Review

[¶15.]     We review a denial of a motion for judgment of acquittal de novo. *State v. Ware*, 2020 S.D. 20, ¶ 12, 942 N.W.2d 269, 272. In doing so, we determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Martin*, 2015 S.D. 2, ¶ 13, 859 N.W.2d 600, 606 (quoting *State v. Brende*, 2013 S.D. 56, ¶ 21, 835 N.W.2d 131, 140). "[W]e accept the evidence and the most favorable inferences fairly drawn therefrom, which will support the verdict." *State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83 (quoting *State v. Jensen*, 2007 S.D. 76, ¶ 7, 737 N.W.2d 285, 288). "This Court will not resolve conflicts in the evidence, assess the credibility of witnesses, or evaluate the weight of the evidence." *Id.* (citation omitted).

---

(. . . continued)
        proposition that money received by a contractor on a contract is not held in an actual or constructive trust but rather is "his own money which he can then use to pay himself or other contractors."

**Analysis and Decision**

[¶16.] Under SDCL 44-9-13, theft by misappropriation of funds by a contractor occurs when:

> [a]ny contractor . . . on any improvement of real estate, . . . who knowingly uses more than five hundred dollars of the proceeds of any payment made to him on account of such improvement by the owner of such real estate or person having the improvement made, for any other purpose than the payment for labor, skill, materials, and machinery contributed to such improvement while any account for such labor, skill, material, or machinery furnished for such improvement up to the time of such payment remains unpaid and due and owing under the credit terms arranged . . . .

This statute is located in the chapter of the code pertaining to mechanics' and materialmen's liens. *See* SDCL ch. 44-9. Grand theft is defined in SDCL 22-30A-17 and, relevant to the verdict here, is established when the value of the property stolen is more than $5,000 in value but less than or equal to $100,000.

[¶17.] We have not before examined SDCL 44-9-13 or addressed what evidence is necessary to sustain a conviction under this statute. Suchor contends this statute requires a payment specified for a particular purpose and evidence that the contractor did not ultimately use the payment for such purpose. We disagree. Nothing in the language of the statute requires such a direct connection between monies paid and accounts due.[5] Rather, the statute refers to the use of more than

---

5. The circuit court appeared to have acknowledged this general concept when it instructed the jury that "it is not a violation for a Contractor to pay himself for his services in connection with the improvement of the real estate in question." This instruction comports with the terms of the statute because under SDCL 44-9-13, so long as the homeowner's payments are generally applied to the project itself, there is no crime associated with a failure to apply proceeds of any payment toward a particular bill.

$500 of the proceeds of *any payment* for the improvement of real estate for any purpose other than labor, skill, materials, or machinery contributed to the improvement. Further, the phrase "up to the time of such payment" requires that labor, skill, or materials giving rise to an unpaid bill must have already been furnished at the time the homeowner made the payment to the contractor. If the contractor then knowingly uses at least $500 from such payment for a purpose not related to the project *while an unpaid bill for such items furnished is due and owing under the credit terms arranged*, the crime defined in SDCL 44-9-13 has been committed.

[¶18.] Suchor's further arguments more pointedly address the proper interpretation of the statute as outlined above. He contends the State failed to prove one or more necessary elements to sustain each conviction beyond a reasonable doubt. In particular, Suchor highlights that under the contracts at issue, he was to receive "milestone" payments corresponding to the completion of different phases of the construction projects. He then claims that by structuring his contracts in this manner, he "had built in allowances for project costs, overhead and profit into each scheduled milestone payment." Thus, in his view, absent evidence establishing where he spent the payments when accounts were due and owing, the State could not prove each element of theft by misappropriation beyond a reasonable doubt. Because each count on which Suchor was convicted concerns a different construction project, we examine the sufficiency of the evidence in regard to each project separately.

*The Dahl Project*

[¶19.] Suchor contends that the State presented no evidence that any account for labor, skill, material, or machinery was unpaid and owing at the time the Dahls paid Suchor $25,000. He emphasizes that no subcontractors had been hired and no amounts were owed on account of labor, skill, materials, or machinery furnished to the Dahl project. The State responds that because Suchor was required to obtain a building permit before he could start construction, the permit fees are "sums of money [Suchor] owed when he took, and refused to return, the Dahls' $25,000.00." The State further claims the jury could infer that Suchor owed money to subcontractors who were preparing to work on the Dahl project because after he was fired, Suchor issued a letter to the Dahls' attorney indicating that he had already scheduled his subcontractors and may be liable to them and to real estate agent Donahue for a referral fee.

[¶20.] However, a review of the record in a light most favorable to the verdict reveals no evidence to support that at the time the Dahls paid Suchor, or any time thereafter, "any account for such labor, skill, material, or machinery furnished for such improvement" was "unpaid and due and owing under the credit terms arranged . . . ." *See* SDCL 44-9-13. First, Suchor never obtained a building permit; therefore, no monies were due to the City of Spearfish. Second, regardless of Suchor's representations in his letter to the Dahls' attorney, it is undisputed that no monies were due to any subcontractors. Third, Donahue specifically testified that

she was not owed any money from Suchor connected to the Dahl project.[6]  Even if

Donahue had been owed a referral fee, her services would not constitute "labor,

skill, material, or machinery furnished" for the "improvement of real estate[.]"

Because the State did not present any evidence on an essential element of the

offense, the circuit court erred in denying Suchor's motion for judgment of acquittal

as to this count.

*The Pavich Project*

[¶21.]        The State's case relating to the Pavich project centered upon the

following three events, which are, for the most part, undisputed:

> (1) Wires R Us had completed the rough-in portion of the bid for
> electrical work on the project and, in March 2017, had invoiced
> Suchor for 80% of their bid price (per its usual terms); but at the
> time Suchor stopped working on the Pavich project, this
> $16,681.66 invoice remained unpaid.
>
> (2) In April 2017, Suchor invoiced, and Pavich paid (as part of a
> larger draw request), $1,800 for a central vacuum system for
> which Suchor had installed piping and outlets; but Suchor failed
> to deliver the vacuum unit to complete the system.

---

6.     *See State v. Pierson*, 86 A.2d 559 (Del. Sup. Ct. 1952).  In *Pierson*, the court
       examined whether an offense occurs when "a building contractor is charged
       with misappropriation of money received by him for the construction of a
       house, but where he is not charged with failure to pay actual claims of
       persons furnishing labor and materials for the house[.]"  *Id.* at 561.  The
       indictment at issue charged "that the defendant received money 'in
       connection with a contract . . . for the sale of land . . . and for the construction
       of a house thereon and did thereafter . . . pay out, use and appropriate the
       said money prior to paying any of the money so received to satisfy lawful
       claims of any persons . . . for labor and/or materials contemplated in the
       aforesaid contract[.]'"  *Id.* at 560.  The court concluded that "[i]t is clear that
       this Statute has not been violated unless there are unpaid claims for labor
       and materials which should have been paid by the contractor out of the
       moneys misappropriated by him."  *Id.* at 562.

(3) In May 2017, Suchor invoiced (as part of a separate draw request), and Pavich paid, $3,576.50 for quartz countertops that Suchor never ordered or delivered.

[¶22.] Suchor does not dispute that Pavich made payments to him after Wires R Us had invoiced Suchor for work already done on the project and that this bill remained due and owing.[7] However, Suchor asserts that the State failed to present sufficient evidence that he knowingly used any of the proceeds of Pavich's payments for purposes *other than* labor, skill, materials, and machinery on the Pavich project. Suchor points to the fact that the record does not contain any of his bank statements, and the State did not present evidence tracing where the funds paid on any of the three projects were actually spent. He thus contends that given the absence of evidence tracking his use of Pavich's payments, and because Pavich still owed him additional funds under the contract when they parted ways, "it is impossible to determine circumstantially if the money he received for the project was misappropriated for some other purpose such as would violate §44-9-13."

[¶23.] The State argues, in response, that the jury could infer Suchor used payments from Pavich for purposes other than labor, skill, materials, or machinery for this project, and that he intended to deprive the Paviches of their funds because: (1) Pavich paid Suchor $329,000 under the contract; (2) $16,681.66 was due and

---

7. Suchor maintained that because the electrical finishing work is typically one of the last phases completed, he could wait until the end of the project to pay this bill. A witness from Wires R Us testified that Suchor was often a "late payor." Notably, the Wires R Us bill is the only unpaid invoice at issue for the Pavich project. There is no evidence in the record to suggest that any amounts were due and owing to other contractors or suppliers for the central vacuum system and quartz countertops.

owing to Wires R Us; and (3) Suchor did not pay the outstanding invoice. In order to draw the necessary inference that Suchor misappropriated funds, the State relies upon the fact that Suchor ran a cash-based business that operated out of a single checking account, and Suchor admitted to commingling money from all projects.[8] The State further directs this Court to Suchor's testimony that he could not specifically track where project money was spent. Finally, the State notes that during the general timeframe when the Wires R Us bill was outstanding and Suchor was invoicing Pavich for items he ultimately never purchased (i.e., the central vacuum and quartz countertops), Suchor had an overdrawn bank account in January 2017 and later bounced a check to J&M Drywall on the Feeser project in August or September 2017.

[¶24.] As a starting premise, SDCL 44-9-13 does not, contrary to the State's suggestion, prohibit a contractor from operating a cash-based business with only one general account. While a contractor operating in this fashion (depositing funds into and paying bills out of one account) must nevertheless pay the subcontractors and suppliers on any given project in a timely manner to avoid running afoul of SDCL 44-9-13, it was not Suchor's burden at trial to prove how he spent the payments he received from Pavich. Rather, it was the State who bore the burden of proving beyond a reasonable doubt that Suchor knowingly used proceeds from any

8. The State directs this Court to cases from other jurisdictions related to contractor theft or misappropriation to support its argument that the evidence is sufficient to sustain Suchor's convictions. These cases, however, are factually distinguishable and the distinctive statutes upon which they were decided do not assist in our interpretation and application of SDCL 44-9-13.

payment by Pavich for purposes other than labor, skill, materials, or machinery for improvements on this project, and that he did so while any account for items already furnished for such project prior to the receipt of Pavich's payments remained unpaid, due, and owing. From our review, the State did not present sufficient evidence to meet this burden.

[¶25.] While the record contains multiple payments to Suchor under the contract, the record does not contain evidence showing how Suchor spent this money. The State did not offer or obtain Suchor's bank records to show whether he deposited Pavich's payments and, if so, what disbursements were made from the account. Moreover, it does not appear from the record that Pavich had paid Suchor the entire contract price at the time they parted ways on the project, and the record is unclear as to whether some of the amounts Pavich paid Suchor were owed pursuant to the contract price or as reimbursement to Suchor for the considerable overages and upgrades.[9] Finally, it is apparent in the State's evidence and presentation of the case, that the State was more focused on proving the later dismissed theft by deception charges (for which the State's proof revolved around Suchor's failure to perform), rather than on proving the elements necessary for a conviction under SDCL 44-9-13.

---

9. The amount Pavich paid under the contract terms is disputed. Suchor claimed he had received only $275,000 of the $332,000 contract price, and the remaining payments were for change orders or extras which Pavich agreed to pay over and above this price. In any event, given the State's assertion that $329,000 had been paid on the contract, there appears to be no dispute that Pavich had not yet paid the full contract price.

[¶26.] Without evidence showing how Suchor spent the money he received from Pavich, the jury had no reasonable basis from which it could infer that Suchor knowingly used these payments for purposes other than labor, skill, materials, or machinery for the improvement of Pavich's home, and even less of a basis from which it could infer that Suchor improperly spent the money while the Wires R Us bill remained due and owing. While Suchor's failure to purchase the central vacuum unit and countertops after having received payments from Pavich for these items could conceivably give rise to civil liability on the contract, a conviction under SDCL 44-9-13 requires the State to establish, circumstantially at the very least, that Suchor used these payments for some other purpose than costs related to the Pavich project. Because such critical evidence is absent in this record, the circuit court erred in denying Suchor's motion for judgment of acquittal on this count.

*The Feeser Project*

[¶27.] Similar to his argument related to the Pavich project, Suchor contends that the State failed to present any evidence that Suchor knowingly spent payments received from Feeser for purposes other than labor, skill, materials, or machinery on this project. The only unpaid subcontractor bill at issue on the Feeser project relates to a $13,184 bill owed to J&M Drywall, which Feeser ultimately paid after he fired Suchor.

[¶28.] To prove that Suchor misappropriated Feeser's funds, the State relied on a $20,000 payment Feeser made to Suchor on July 10, 2017—a "milestone" payment under the contract, due upon completion of the drywall—and the fact that Suchor did not pay the outstanding bill owed to J&M Drywall. Suchor, on the other

hand, testified that the drywall was in fact completed when he requested this payment, but explained that these milestone payments were more in the nature of progress payments and did not necessarily correlate to an amount spent on the particular type of work noted as the benchmark for such payment. He further explained that he did not remit the final payment to J&M Drywall because Feeser owed him over $13,000 under the contract for other services performed and that Feeser had agreed to pay him $13,850 at closing on the sale of the house.[10]

[¶29.]     Similar to the Pavich project, a review of the circumstances surrounding the Feeser project is complicated by the fact that Suchor never finished the job and the fact that Feeser never paid the entire amount due on the contract. Moreover, as with the payments related to the Pavich project, the State did not present any evidence showing how Suchor used the $20,000 payment from Feeser. The State did not obtain or offer Suchor's bank records to show whether he deposited the $20,000 check and, if so, what disbursements were made from the account after that point. Rather, the State again relied on Suchor's commingling of funds in one bank account.

[¶30.]     While we deem it insufficient to infer from the general commingling of Suchor's funds that more than $5,000 of these proceeds (the threshold amount the jury found Suchor misappropriated) were used for something other than the Feeser

_____

10.   The record reflects that Suchor filed a lien on the Feeser property for $57,177.00 after the sale of the house fell through. Suchor testified that he received $369,866 from Feeser on the $385,000 contract, so it is not clear how he arrived at this lien amount. Nevertheless, Feeser admitted that he owed Suchor additional amounts under the contract. Also, it is undisputed that after Feeser decided to sell the home, Feeser made no further payments to Suchor on the contract.

project, even if such an inference could conceivably be drawn, there is nevertheless insufficient evidence to establish the other essential elements of the Feeser charge. In particular, it is difficult to discern from the record *when* the remaining balance owed to J&M Drywall became due and owing. Notably, there is no invoice from J&M Drywall in the record. The State also failed to admit any evidence regarding the credit terms Suchor had arranged with J&M Drywall. The only documentation admitted at trial showing an amount due to J&M Drywall was a lien waiver prepared by J&M Drywall on August 9, 2017, referring to a "full and final payment" of $13,184.[11] Further, while there are text messages in the record between Suchor and a J&M Drywall employee to support an inference that the bill became due and owing by early August 2017, the minimal evidence in the record does not support an inference that during this timeframe, Suchor had spent more than $5,000 of the proceeds he received from Feeser for purposes other than labor, skill, materials, or machinery on the Feeser project.

[¶31.] Without evidence from which the jury could have inferred that Suchor used Feeser's money while the drywall bill was unpaid and due and owing for a purpose other than the Feeser project, the conviction on this charge cannot stand. The remaining dispute between the parties over amounts spent and due on this

---

11. This lien waiver was dated on the date Feeser was set to close on the sale of the home to Suchor's brother, but this sale did not ultimately occur, and it is unclear when, and if, this waiver was provided to Feeser. Although unrelated to the outstanding bill at issue here, the record does reflect that Suchor had made prior payments connected to the drywall. The record contains a receipt showing that Suchor spent $6,921 on drywall on June 16, 2017 and a check by Suchor on June 28 issued to and cashed by J&M Drywall for $4,000. Both the receipt and check note that these were amounts spent on the Feeser project.

project must be resolved in the parties' civil case. The circuit court erred in denying Suchor's motion for a judgment of acquittal as to this count.

[¶32.] Reversed.

[¶33.] JENSEN, Chief Justice, and KERN and SALTER, Justices, and GILBERTSON, Retired Justice, concur.

[¶34.] MYREN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.